**Arlin SHIELDS, 499–40–2131, Plaintiff,**

**v.**

**Louis SULLIVAN, M.D., Secretary of Health and Human Services, Defendant.**

**No. 92 C 875.**

United States District Court, N.D. Illinois, E.D.

Sept. 14, 1992.

**152**

Mark DeBofsky, DeBofsky & DeBofsky, Chicago, Ill., for plaintiff.

Lori Miller, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Arlin Shields ("Shields") seeks judicial review of a final decision of Secretary of Health and Human Services Louis Sullivan ("Secretary") denying Shields' claim for disability insurance benefits under the Social Security Act ("Act") §§ 216(i) and 223, 42 U.S.C. §§ 416(i) and 423.[1] As is usual in these cases, both sides now move for summary judgment under Fed.R.Civ.P. ("Rule") 56.[2]

Under ordinary circumstances the reasons stated in this memorandum opinion and order would call for the denial of both motions. But given the command of *Melkonyan v. Sullivan,* —— U.S. ——, 111 S.Ct. 2157, 2163–65, 115 L.Ed.2d 78 (1991) and its progeny, it is necessary to enter a final order at this time. Accordingly Secretary's decision is reversed and this action is remanded to Secretary for further proceedings.

### Facts

Shields was born on March 25, 1937 and completed school through the eighth grade (R. 28). He has been employed by Oscar Mayer Foods Corporation ("Oscar Mayer") since 1956. Although still employed by Oscar Mayer at the time of his administrative hearing (the "Hearing"), Shields has been on sick leave since March 1989.[3] Be-

---

**1.** All further statutory references will take the form "Section—," using the Title 42 numbering rather than the Act's internal numbering. All portions of 20 C.F.R. will be cited "Reg. § —."

**2.** What follows in the "Facts" section of this opinion, drawn as it is from the administrative record ultimately brought to Secretary for decision, is not in dispute. Hence this case does not pose the usual cross-summary-judgment-motion challenge of looking in opposite directions on the two motions—of drawing "those inferences that are reasonable" in the light most favorable to each nonmovant (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991)). All citations to the Administrative Record (the sole point of reference needed to decide the issues) will take the form "R. —."

**3.** Shields received sick pay through June 1, 1990 (R. 34). Nonetheless, because he has not engaged in "substantial gainful activity" since March 1989 (Reg. §§ 404.1510, 404.1572), he is qualified to seek benefits (Reg. § 404.1520(b)).

fore that he had worked as a machine mechanic in charge of "high speed closers," which had required him to lift objects weighing up to 150 pounds (R. 28–29, 32). Shields took sick leave because of problems related to high blood pressure (R. 32) and has not worked since that time.

*Shield's Testimony*

Shields had been having trouble with his blood pressure for about a year before he stopped working. While vacationing in Tennessee in March 1989 he "passed out" due to high blood pressure. He was hospitalized and was unable to return home to Chicago for eight weeks (R. 32–33).

Currently Shields also suffers from dizzy spells, which he described in this way (R. 38):

I don't fall, it's just, like, I don't usually—I don't keep this cane all the time but if I'm going to be standing very much, you know, or anything, you know, I have to have it like to balance myself because if you get dizzy—like two weeks ago I started down the steps and I had a dizzy spell, there's only about five steps, and rather than fall, I grabbed the, the railing and pulled the tendons in my arm. So, the thing of that is I don't ever know when this is going to happen.

In addition Shields has pain in his back, neck, right shoulder and right arm (R. 35, 60). As he described it, "the pain starts in my neck and then eventually gets down in my back and my right arm" (R. 35). Occasionally the pain is accompanied by numbness in his right hand (R. 43, 61). Shields is always stiff and his neck pain is constant, but only sometimes severe (R. 52, 56). In those instances of severe pain, Shields takes his medication (Robaxin), which helps "a lot" but also makes him "slow" (R. 53, 56–57). Shields also has swelling in his legs (R. 43, 61), asthma (R. 47) and high cholesterol (R. 36), and he is a borderline diabetic (R. 39).

On a typical day Shields takes a bath first thing in the morning to relieve his pain and stiffness (R. 52). He helps around the house by vacuuming and cooking, but he is unable to carry groceries because of his back and neck pain and cannot drive because his medication dulls his reactions (R. 52–53). He watches a lot of television but needs to change positions and stand up often to relieve his pain (R. 53).

As for his functional limitations, Shields has difficulty climbing stairs because it makes him dizzy and lightheaded (R. 45), and he cannot bend because of dizziness (R 58). Because of his neck and back pain, Shields cannot tilt his head up or down more than briefly (R. 45), cannot do any lifting (R. 38, 58) and cannot sit up straight for long periods (R. 54). During the Hearing Shields stood up twice and shifted positions often to relieve his pain (R. 35, 49, 56). On the advice of his physician, Shields limits his exercise to 2 to 3 daily walks to and from a park that is a block from his house (R. 44–45). Too much walking causes pain in his lower back and neck and numbness in his right hand (R. 46). Shields can stand for one hour without resting (R. 57). He tires easily (R. 44) and needs to lie down for about an hour each afternoon (R. 55).

*Medical Evidence*

During 1989 Shields underwent numerous diagnostic tests. Among them, these yielded negative results:

1. a skull x-ray on June 15 (R. 168);
2. a CT scan of his brain on June 21 (R. 109);
3. an electronystagmography (ENG) on June 27 (R. 110–11);
4. an electromyography (EMG) study of the arms and cervical-paraspinal muscles on July 18 (R. 130–31); and
5. an extracranial Doppler on August 1 (R. 112–16).

X-rays taken on March 16 were normal for the chest and right wrist but revealed some abnormalities in Shields' cervical spine (R. 168):

CERVICAL SPINE shows moderate degenerative changes with anterior osteophytes [4] involving C4–C5 & C6. Some mild to moderate posterior arthrosis is

---

**4.** [Footnote by this Court] "Osteophyte" is a bony outgrowth (*Stedman's Medical Dictionary* 1004 (5th Unabridged L.Ed.1982) [*"Stedman's"*] ).

seen at the C4–C5, C6, and C7 levels. Soft tissues appear within normal limits. IMPRESSION: Degenerative changes.

Finally, a Holter monitor revealed some AV blockage on August 23 (R. 117–26).

Shields' treating physician Dr. E. Lacuesta referred him to an orthopedic consultant, who saw Shields on September 11, 1989 and provided this report (R. 150):

> The patient has chronic pain in his neck and right shoulder. He has seen many physicians and has had multiple tests including MR Scans, CT, EMG, etc. All have included that he has Osteoarthritis of the Cervical Spine. On examination he has tenderness over the C–7 and a slight decrease in spine range of motion. He has a slightly positive impingement test of the right shoulder with a painful arc above 100 degrees. Diagnosis of Osteoarthritis of the Cervical Spine and perhaps, mild Rotator Cuff Tendinitis. Recommendation is continue with anti-inflammatory management.

Then on October 6 Dr. Lacuesta completed a cardiac report and an arthritic report (R. 136–39). There Dr. Lacuesta said that Shields' diagnosis was syncopal[5] episode, hypoglycemia and osteoarthritis of the cervical spine with radiculopathy. Dr. Lacuesta also reported anatomical deformities including bone destruction and hypertrophy, and she also noted "resistent pain in shoulders and arms" and "unexplained vertigo with complete workup."

On November 6 a consulting physician whose signature is indecipherable completed a "Residual Physical Functional Capacity Assessment" based on the evidence then of record (R. 140–47). Boxes checked on that document said that Shields can lift up to 50 pounds occasionally and up to 25 pounds frequently,[6] can stand, walk and sit for up to 6 hours of an 8–hour day, and has an unlimited capacity to push and pull with his hands and feet. It also reflected that Shields had no postural, manipulative, visual, communicative or environmental limitations, except that he should avoid "extremely hazardous working conditions" because of his vertigo and syncope.

On February 15, 1990 Dr. Banerjee, another treating physician, completed arthritic and neurological reports (R. 178–81).[7] He diagnosed Shields' ailments as asthma, hypertension, degenerative joint disease, bronchitis, vertigo and syncope. Dr. Banerjee found that Shields had swelling and tenderness in his right knee and some loss of motion in his right knee and spine. He also observed that Shields had limited ability to handle and finger with both hands, that Shields needed a cane for balance when he is dizzy and that "due to excessive vertigo and multiple problems [Shields] is unable to work in dangerous places or lift weights." Shields' neurological exam revealed slight motor changes in all four extremities and a tremor when Shields extended his hands, but was otherwise normal.

On February 28, 1990 another consulting physician, Dr. William J. Conroy, completed a residual functional capacity ("RFC") assessment (R. 183–90). His conclusions were identical to those of the previous consultant. He also observed that due to dizziness, Shields should "avoid concentrated exposure" to hazards such as machinery and heights.

On June 25, 1990 Dr. M. Moustafa, another treating physician, completed an "illness and accident report" for purposes of Shields' sick leave from Oscar Mayer (R. 207).[8] He stated that Shields' diagnosis was "depression state" and recommended that Shields have a psychiatric evaluation and consider taking antidepressant medication.

---

**5.** "Syncopal" refers to "a fainting or swooning; a sudden fall of blood pressure or failure of the cardiac systole, resulting in cerebral anemia and subsequent loss of consciousness" (*Stedman's* at 1382).

**6.** "Frequently" means between ⅓ and ⅔ of an 8–hour day, while "occasionally" means from very little to ⅓ of an 8–hour day (R. 140).

**7.** On January 4, 1990 Shields had had another chest x-ray, which was again normal (R. 176).

**8.** That report was submitted to the ALJ on November 27, 1990—after the October 10, 1990 hearing but before the ALJ issued his January 24, 1991 opinion.

In addition to the numerous doctors' reports, the record also contains treatment notes from the Union Medical Center. Those cover various dates between June 1989 and June 1990 (R. 148–77, 212–19).

*Vocational Testimony*

Vocational expert Dr. William G. Fischer ("Fischer" [9]) testified at Shields' Hearing. Administrative Law Judge ("ALJ") Arlander Keys asked Fischer whether there were any jobs available in the Chicago area that Shields could perform, assuming that Shields was limited to light work, had limited ability to move his neck up and down and could not be exposed to pulmonary irritants, heights or moving machinery. Fischer opined that Shields could work as a packer, assembler or tester of small manufactured items or as an order taker for items such as hardware or electrical equipment. Fischer said that numerous such jobs were available and added that in many of them Shields would be able to sit or stand as needed.

*Statutory and Regulatory Framework*

Section 423(d)(1)(A) defines disability as: inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months....

*Young v. Secretary of HHS*, 957 F.2d 386, 389 (7th Cir.1992) (case citations omitted) explains the process that guides Secretary's evaluation of a disability claim:

When considering whether a claimant is eligible for benefits, the Secretary uses a five-step inquiry: 1) is the claimant presently unemployed; 2) is the claimant's impairment or combination of impairments severe; 3) does the impairment meet or exceed any of the list of specific impairments (the grid) that the Secretary acknowledges to be so severe as to preclude substantial gainful activity; 4) if the impairment has not been listed by the Secretary as conclusively disabling, is the claimant unable to perform his or her former occupation; and 5) if the claimant cannot perform the past occupation, is the claimant unable to perform other work in the national economy in light of his or her age, education and work experience. A negative conclusion at any step (except for step three) precludes a finding of disability. An affirmative answer at steps one, two or four leads to the next step. An affirmative answer at steps three or five results in a finding of disability. 20 C.F.R. § 404.1520 (1991).

If the assessment of an individual reaches step 5, the rules in the Medical Vocational Guidelines of Reg. Part 404, Subpt. P, App. 2 (the "Grid") come into play. Those Grid rules reflect an analysis of the vocational factors of age, education and work experience (Reg. §§ 404.1563–.1565) in combination with the claimant's RFC, which is defined by Secretary as (*Marcus v. Sullivan*, 926 F.2d 604, 608 (7th Cir.1991), quoting SSR 83–10):

[a] medical assessment of what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s).

RFC is expressed in terms of a claimant's maximum sustained work capability for either "sedentary," "light," "medium," "heavy" or "very heavy" work as those terms are defined in Reg. § 404.1567. Where an ALJ's findings of fact as to the vocational factors and RFC coincide with all the criteria of a particular Grid rule, the rule directs a conclusion of "disabled" or "not disabled."

---

**9.** Although the ALJ addressed him as "Doctor" and he referred to himself in the same way (R. 62), Fischer is not a physician. Instead his resume (R. 193–94) reflects a Ph.D. in psychology. Quite apart from whatever else may be suggested about a person by such self-usage (for example, does any lawyer with a J.D. degree—except in Germany, where "Herr Doktor" is part of the common reference to those in the legal profession—think of referring to himself or herself in that fashion?), to avoid confusion this opinion omits the "Dr." designation that it has reserved for those giving medical opinions, because the subject matter on which Fischer himself opined was nonmedical.

*Procedural History and Administrative Findings*

Shields applied for disability insurance benefits on September 25, 1989, claiming that he had been disabled since March 15, 1989 (R. 67–69). His application was denied both initially and upon reconsideration, after a determination in each instance that although Shields could not return to his former occupation, he could perform other less demanding jobs (R. 70–71, 74–75).

Shields requested and received a de novo hearing, which was held before ALJ Keys on October 10, 1990. ALJ Keys denied Shields' application on January 24, 1991 in an opinion that included these findings (R. 22):

3. The medical evidence establishes that the claimant has severe hypertension, controlled without end organ damage; coronary AV block, type 2; degenerative arthritis of the cervical spine of a mild to moderate degree; and dizziness of an undetermined etiology, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's subjective complaints are not credible as assessed within the guidelines of Social Security Ruling 88–13. The signs and findings fail to establish any impairment or combination of impairments that would reasonably produce symptomology of the location, nature, duration and intensity alleged. Inconsistencies in the claimant's testimony, the type and effectiveness of his medication, and observations of his appearance and demeanor contradict much of his testimony, particularly concerning a limitation in activities of daily living secondary to symptoms.

5. The claimant has the residual functional capacity to perform the physical exertion requirements of work except for lifting in excess of fifty pounds occasionally or twenty-five pounds frequently, working in environments where he would be exposed to concentrated levels of pulmonary irritants or dangerous moving machinery. There are no nonexertional limitations (20 CFR 404.1545).

6. The claimant is unable to perform his past relevant work as a mechanic.

7. The claimant's residual functional capacity for the full range of medium work is reduced by the inability to work around heights or dangerous moving machinery, or in environments where he would be exposed to concentrated levels of pulmonary irritants. While the undersigned does not find that the claimant has such limitations, he also considered in a hypothetical to the vocational expert such limitations as being limited to simple, unskilled light exertional work with a sit/stand option that did not require constant movement of the neck.

\* \* \* \* \* \*

11. If the claimant had the capacity to perform the full range of medium work, section 404.1569 of Regulations No. 4 and Rule 203.19, Table No. 3 of Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion that the claimant is not disabled. If the claimant were limited to no more than the full range of light work, Rule 202.11, Table No. 2 would direct a conclusion of disabled.

12. Although the claimant's exertional limitations do not allow him to perform the full range of medium work, using the above-cited rules as a framework for decisionmaking, there are a significant number of jobs in the national economy which he could perform. Examples of such jobs are: 7,000 small packaging jobs; 5,000 assembly jobs; 3,500 order taker jobs; and 6,000 tester or checker jobs in the six county metropolitan area. The Secretary can, thus, sustain his burden of proving that there are significant numbers of jobs in the national economy that the claimant can perform consistent with his age, education, work experience and residual functional capacity.

13. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(f)).

Following the ALJ's decision, Shields requested review by the Appeals Council.

When that request was denied on December 5, 1991, ALJ Keys' decision became Secretary's final decision (R. 2–3).

### Standard of Review

Section 405(g) empowers this Court to affirm, modify or reverse Secretary's decision, with or without remand for rehearing. Section 405(g) also provides, however, that "the findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." As taught by many cases, including *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir.1987) (citation omitted):

> [A]fter review we must accept the findings of the ALJ if supported by substantial evidence. In so doing, we may not decide the facts anew, reweigh the evidence, or substitute our own judgment for that of the ALJ.

"Substantial evidence" means (*Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)):

> more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

"Substantial evidence may be something less than the greater weight or preponderance of the evidence" (*Young*, 957 F.2d at 389), and a finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion (*Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir.1986) (per curiam)).

Shields contends that ALJ Keys' decision is not supported by substantial evidence. Specifically he charges that:

1. the ALJ did not adequately explore the possibility that Shields has a mental impairment,

2. the ALJ improperly relied on the RFC assessments of consulting physicians and

3. the ALJ improperly discounted Shields' subjective testimony as to his pain.

This opinion will address those contentions in turn.

### Possible Mental Impairment

Two pieces of record evidence reflect that Shields suffers from depression:[10]

1. a reference to depression in Shields' treatment notes dated July 19, 1989 (R. 164) and

2. Dr. Moustafa's June 25, 1990 diagnosis of "depression state," which Dr. Moustafa considered the cause of Shields' inability to work between April 1989 and June 1990 and which caused Dr. Moustafa to recommend that Shields undergo a psychiatric evaluation and consider taking antidepressant medication (R. 207).

Shields contends that the ALJ wrongfully discounted that evidence. He argues (1) that the ALJ did not comply with the procedure for evaluating mental impairments set out in Reg. § 404.1520a and (2) that the ALJ should not have dismissed the possibility of a mental impairment without first having obtained expert input. Shields is right on both counts.

As Shields points out, Reg. § 404.1520a sets out a special analytic procedure that must be followed when there is evidence of a possible mental impairment.[11] It also

---

**10.** "Depressive syndrome" is a mental disorder contained in the listing of impairments (Reg. Part 404, Subpt. P, App. 1, § 12.04(A)(1)).

**11.** That procedure, which occupies nearly two pages in C.F.R., is quite intricate. More briefly it requires Secretary (1) "to record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" to determine whether a mental impairment exists, (2) "to indicate whether certain medical findings which have been found especially relevant to the ability to work are present or absent," (3) "to rate the degree of functional loss resulting from the impairment(s)" in "[f]our areas of function considered by us as essential to work," and based on those findings (4) to "determine the severity of the mental impairment(s)." As with physical impairments, Secretary must then determine whether the impairment meets or equals a listed mental disorder and, if it does not, must assess the claimant's RFC to decide whether or not he or she is able to work. In addition, Reg. § 404.-1520a(c)(4) provides:

requires that a standard form documenting the steps of that procedure must be completed at each level of review, and that form must be appended to decisions of the ALJ or the Appeals Council (see *Howell v. Sullivan,* 950 F.2d 343, 348 (7th Cir.1991) and *Stambaugh v. Sullivan,* 929 F.2d 292, 295 (7th Cir.1991)).

ALJ Keys neither completed that standard form nor conducted the required analysis. Instead, he simply dismissed the evidence of depression (R. 15):

> The undersigned notes the June 25, 1990 entry in Exhibit 23, which indicates that the claimant was in a depressive state and that he needed a psychiatric evaluation. However, he refused to have such an evaluation or to accept medications for depression. The claimant does not allege any mental impairment in his applications or testimony and the undersigned specifically finds that there is no evidence of a medically determinable mental impairment (Exhibits 19 and 23).

 Each of those stated reasons for rejecting Shields' evidence is flawed. ALJ Keys' assertion that Shields refused to have a psychiatric evaluation *or* to take antidepressant medication is not supported by any record evidence. And the fact that Shields had not previously alleged a mental impairment *did not in any way diminish* the ALJ's duty to explore that possibility. Reg. § 404.1520a(d)(1)(iii) explicitly recognizes that evidence of a mental impairment may arise for the first time at the ALJ level and requires that it be considered

anyway. If anything, the fact that the ALJ received Dr. Moustafa's report only *after* the Hearing had already been completed heightened the ALJ's obligation to insure that this new issue was adequately explored.

 Despite those errors, Secretary argues that the ALJ was nonetheless correct to bypass Reg. § 404.1520a because the evidence of a mental impairment was not sufficient to trigger the regulation's requirements. Secretary relies on *Howell,* 950 F.2d at 348–49, which found that the regulation did not come into play when (1) the only evidence of a mental impairment was the subjective testimony of the claimant and his wife and (2) that testimony was not supported by any objective medical evidence. But unlike *Howell,* the evidence in this instance includes a treating physician's diagnosis of depression severe enough to have prevented Shields from working. Moreover, another treating physician had earlier noted depression.[12] That medical evidence was sufficient to have warranted a Reg. § 404.1520a analysis (see *Hill v. Sullivan,* 924 F.2d 972, 974 (10th Cir.1991) (per curiam), which held that the Reg. § 404.1520a analysis was required when the only evidence of an impairment was a psychiatrist's diagnosis of "chronic fatigue and lack of energy; this possibly could be more likely to be chronic mental depression in the patient").[13]

Given the presence of evidence that triggered the Reg. § 404.1520a requirements,

---

At all adjudicative levels we must, in each case, incorporate the pertinent findings and conclusions based on this procedure in our decision rationale. Our rationale must show the significant history, including examination, laboratory findings, and functional limitations that we considered in reaching conclusions about the severity of the mental impairment(s).

Finally, as noted in the text, Reg. § 404.1520a(d) requires that:

> [a] standard document outlining the steps of this procedure must be completed by us in each case at the initial, reconsideration, administrative law judge hearing, and Appeals Council levels.

**12.** This is not to suggest that the first doctor's observation, which was one brief notation in a

whole series of symptoms, would have brought the regulation into play—that would place an improper burden on the ALJ to pick up every possible nuance that might be buried in a mass of medical evidence. But Dr. Moustafa's post-Hearing report focused exclusively on "depression state" and recommended a psychiatric evaluation. ALJ Keys correctly spotted the evaluation, but he then ignored his own regulation-dictated obligation.

**13.** It should be pointed out that a claimant need not establish the existence of a "medically determinable mental impairment" (as the ALJ concluded that Shields had not) to bring the Reg. § 404.1520a requirements into play. Instead one of the scheme's very purposes is to determine "[w]hether or not a mental impairment(s) exists" (Reg. § 404.1520a(b)(1)).

the ALJ was obligated to complete the record as to Shields' possible mental impairment by seeking an expert evaluation. As *Stambaugh*, 929 F.2d at 296 explained:

> Although the regulations do not mandate a psychiatric or psychological evaluation of every alcoholic who claims a disability, the regulations do severely limit proceeding without a medical advisor and seem to presume that an ALJ has before him expert evaluation of the mental impairment.

Similarly, although *Howell* found that an expert evaluation was not required in that case because of the limited evidence of an impairment, it confirmed (950 F.2d at 348) that when Reg. § 404.1520a does come into play, expert input is required if it is a necessary precondition to the ALJ's disability determination. That same conclusion is supported by Section 421(h):

> An initial determination under subsection (a), (c), (g), or (i) of this section that an individual is not under a disability, in any case where there is evidence which indicates the existence of a mental impairment, shall be made only if the Secretary has made every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment.

Here expert input was clearly necessary to conduct a proper Reg. § 404.1520a analysis. Although Dr. Moustafa's statement sufficed to require further exploration of a possible mental impairment, it was obviously not specific enough to support the type of in-depth analysis envisioned by the regulation.[14] This case must now be remanded so that the requisite expert input can be obtained to enable consideration of Shields' possible mental impairment in accordance with Reg. § 404.1520a.

### ALJ's Reliance on Consulting Physicians

■ Shields also contends that the ALJ erred by relying on the consulting physicians' assessment of Shields' RFC. He argues that the ALJ should instead have given greater weight to the contradictory opinion of Shields' treating physician, Dr. Moustafa. It is true that such cases as *Whitney v. Schweiker*, 695 F.2d 784, 789 (7th Cir.1982) express a general preference for the opinion of treating physicians because they are usually more familiar with claimants' conditions than are nontreating physicians.[15] That approach might well operate here, where Dr. Moustafa had both examined and had an ongoing relationship with Shields, while the consultants never examined Shields and had to derive their opinions merely from a review of the paper records.

But Shields' argument cannot prevail even if such a preference were to be placed into the scales, because Dr. Moustafa did not in fact express any opinion about Shields' RFC. Shields points to two forms that Dr. Moustafa completed for Oscar Mayer stating that Shields had been disabled and unable to work due to his various symptoms. But those statements, which express legal conclusions rather than medical opinions, do not provide any relevant information about Shields' RFC. As Reg. § 404.1527 (emphasis in original) explains:

> We are responsible for determining whether you are disabled. Therefore, a

---

14. One of the few specific conclusions that Dr. Moustafa's report *does* actually support on its own is that Shields should undergo a psychiatric evaluation.

15. This Court is of course well aware of the competing considerations that sometimes point in the opposite direction—in favor of a consultant rather than a treating physician (see its recently reported opinion in *Maxwell v. Sullivan*, 792 F.Supp. 582, 589–90 (N.D.Ill.1992)). In a related area, *Peabody Coal Co. v. Director, Office of Workers' Compensation Programs*, 972 F.2d 178, 181–82 (7th Cir.1992) recently revisited the treating physician rule in the context of black lung benefits. It too teaches that a rational weighing of the factors favoring each opinion is preferable to a blanket preference for treating physicians. It seems that the arguably mixed signals that have emanated from judicial opinions in this area may be a thing of the past: Effective August 1, 1991 Secretary promulgated a new regulation (Reg. § 404.1527(d)) that sets out criteria as to the weight to be given to medical opinions derived from different sources.

statement by your physician that you are *disabled* or *unable to work* does not mean that we will determine that you are disabled. We have to review the medical findings and other evidence that support a physician's statement that you are *disabled.*

Even more to the point, *Garrison v. Heckler,* 765 F.2d 710, 713 (7th Cir.1985) (citation omitted) states:

> The treating physician's further assertion that Garrison is disabled from any employment is not a medical statement at all. It is a proposition about how particular medical impairments produce reductions in physical exertion, and how such reductions in exertion affect the ability to work. The treating physician's views do not answer the question or tell the agency what tasks Garrison can and cannot perform.

 Here as in *Garrison* the treating physician did not provide any information that contradicts the consultants' opinions about Shields' RFC. Those latter opinions were therefore the only specific evaluations of Shields' RFC in the record. When a consulting physician's opinion is not contradicted by any record evidence, the ALJ does not err in relying on that opinion, despite the existence of some factors that might otherwise disfavor it (*Steward v. Bowen,* 858 F.2d 1295, 1298–99 (7th Cir. 1988)). Moreover, the consultants' assessments were not "plucked out of thin air" as Shields contends, but were in each instance supported by a recital of the relevant medical evidence. ALJ Keys did not therefore err in relying on the opinions of the consulting physicians as to Shields' RFC.

### Shields' Subjective Testimony

Finally, Shields contends that the ALJ improperly discounted Shields' testimony as to the severity of his pain by failing to consider that testimony according to the procedure set forth in SSR 88–13.[16] Shields points to two portions of that ruling as the basis of the supposed flaw in ALJ Keys' analysis.

 First, Shields argues that the ALJ failed to consider the following factors set forth in the Ruling:

1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);
3. Type, dosage, effectiveness, and adverse side-effects of any pain medication;
4. Treatment, other than medication, for relief of pain;
5. Functional restrictions; and
6. The claimant's daily activities.

But contrary to Shields' assertion, the Ruling does not require the express examination of each of those factors. Instead it merely lists them as being among the considerations that are relevant in evaluating pain allegations. Moreover, ALJ Keys did in fact discuss those listed factors in his discussion of Shields' alleged pain (R. 16).

 Second, Shields asserts that the ALJ did not comply with this SSR 88–13 language:

> In instances in which the adjudicator has observed the individual, the adjudicator is not free to accept or reject that individual's subjective complaints solely on the

---

**16.** As this Court has recently discussed in *Thomas v. Sullivan,* 801 F.Supp. 65, 72–73 (N.D.Ill. 1992), Secretary's new regulation dealing with the evaluation of pain allegations, Reg. § 404.-1529 (1992), has effectively overridden *Moothart v. Bowen,* 934 F.2d 114, 117 (7th Cir.1991) and like cases, all of which had relied on what appeared to be the clear thrust of SSR 88–13 in holding that pain allegations could not serve as a basis for finding disability unless they were supported by objective medical evidence. That result applies even to cases (such as this one) that preceded enactment of the new regulation, because of Secretary's express statement that the new regulation did not effect any change in his policy (56 Fed.Reg. 57,931). Thus the ALJ's finding that "there is no combination of underlying impairments that would reasonably produce symptomology of the nature, location, intensity and duration alleged" (R. 16) is not *alone* a sufficient basis for rejecting Shields' testimony as to pain. As Shields suggests, the ALJ was required to comply with the requirements of SSR 88–13 notwithstanding that finding.

basis of such personal observations. Rather, in all cases in which pain is alleged, the determination or decision rationale is to contain a thorough discussion and analysis of the objective medical evidence and the nonmedical evidence, including the individual's subjective complaints and the adjudicator's personal observations. The rationale is then to provide a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's capacity to work.

Again Shields is wrong. ALJ Keys complied precisely with those stated requirements. He thoroughly discussed both the objective medical evidence and the nonmedical evidence, including Shields' subjective complaints and the ALJ's own observations (R. 14–16). And as SSR 88–13 directs, he logically discussed the inconsistencies in that evidence and set forth a reasoned explanation of his ultimate findings as to Shields' ability to work.[17] Thus ALJ Keys' analysis in the area now under discussion is supported by substantial evidence and complies with SSR 88–13.

### Conclusion

This case must be remanded to Secretary for the limited purpose of (1) developing the record on the issue of a possible mental impairment and (2) considering that impairment in accordance with the requirements of Reg. § 404.1520a. Because ALJ Keys' step 5 determination that Shields is not disabled is otherwise supported by substantial evidence, that decision need not be reconsidered—except of course to the extent that any mental impairment, in combination with Shields' other symptoms, may require a different conclusion.

*Melkonyan* has held that all remand orders that do not come under Section 405(g)'s sentence six (which calls for a remand when certain conditions as to newly-presented evidence are met) fall by definition under sentence four of that Section. That being the case, the order of remand is a final order reversing Secretary's decision

(see *Young v. Sullivan,* 972 F.2d 830, 833–35 (7th Cir.1992)). Accordingly Secretary's decision is reversed, and this action is remanded for further proceedings consistent with this memorandum opinion and order.

---

17. Shields correctly points out that ALJ Keys wrongfully stated that Shields takes Tylenol for relief of his pain, when in fact he takes Robax-in. But that error was certainly not outcome-determinative in light of Shields' own testimony that the medication does in fact relieve his pain.