**Kathleen VAILE a/k/a Kathleen A. Clementi, Plaintiff,**

v.

**Shirley S. CHATER, Commissioner of Social Security, Defendant.**

No. 95 C 605.

United States District Court, N.D. Illinois, Eastern Division.

Feb. 26, 1996.

Ashley S. Rose, Law Offices of Ashley S. Rose, Glen Ellyn, IL, for plaintiff.

Michele Marion Fox, United States Attorney's Office, Chicago, IL, for defendant.

### MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Pursuant to 42 U.S.C. § 405(g), Kathleen Vaile a.k.a. Kathleen A. Clementi ("Vaile") appeals the final decision of the Commissioner of Social Security, Shirley S. Chater ("Commissioner"),[1] denying Vaile's application for Supplemental Security Income ("SSI") under sections 1602 and 1614(a)(3)(A) of the Social Security Act, 42 U.S.C. §§ 1381a and 1382c(a)(3)(A). Both parties move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[2]

### RELEVANT FACTS

The Court begins with a broad overview of the facts, and then reviews the evidentiary record adduced at the hearing in detail. Vaile is a 44 year-old woman who alleges that she became disabled on October 22, 1991, due to back problems. (R. 34). She attended high school through the tenth grade but did not graduate; however, she earned her general equivalency diploma (GED) in 1992. (R. 65, 128, 202). Her full scale I.Q. of 80, which provides an assessment of general intelligence and general occupational and scholastic aptitude, places her in the "low average" classification. (R. 131).

She maintains that her principal impairment is severe back pain, the consequence of a degenerative joint disorder in her lower back. She also complains of chronic knee pain and severe headaches. The onset of

1. This action was originally brought against Health and Human Services Secretary ("Secretary") Donna Shalala. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103–296, § 106(d), 108 Stat. 1464, 1476–77 (1994), the Commissioner of Social Security is substituted for Secretary as the named defendant and is referred to as such throughout this opinion.

2. Technically speaking, motions for summary judgment are procedurally improper vehicles for a decision on the merits of this complaint, which challenges the completeness of the administrative record. *See Garcia v. Califano*, 463 F.Supp. 1098, 1100 (N.D.Ill.1979); *see also Milton v. Harris*, 616 F.2d 968, 975 (7th Cir.1980) (summary judgment procedures not proper where claimant challenges the completeness of the record).

The Tenth Circuit has noted that "summary judgment" may be inappropriate at the district court level in social security cases for two reasons. First, since the district court acts as an appellate court when reviewing these cases, the purpose of summary judgment—to avoid consideration of nontriable issues—is not served because the decision has already occurred at the agency level. *Hamilton v. Secretary of Health and Human Servs.*, 961 F.2d 1495, 1501 (10th Cir.1992) (Kane, J., concurring). Second, the district court does not apply summary judgment standards. *Id.* When a district court reviews an individual social security case, the court's review is limited to a determination of whether the record contains substantial evidence to support the agency's decision, and whether the agency applied the proper legal standards. *Id.; Ehrhart v. Secretary of Health and Human Servs.*, 969 F.2d 534, 538 (7th Cir.1992).

It is this standard we apply here, not the familiar summary judgment standard of "genuine issue of material fact" employed under Rule 56 of the Federal Rules of Civil Procedure. Essentially, we treat the Commissioner's motion for summary judgment as a motion for an order affirming the Commissioner's decision, and Vaile's motion as a motion for an order reversing the Commissioner's decision. *See Garcia*, 463 F.Supp. at 1100–01.

Vaile's impairment dates from November 1988, when she fell and injured her back while working as a nurse's aide. (R. 34, 96, 98, 108). After the accident, she continued to experience intermittent back pain. (R. 96). As a nurse's aide, a portion of her job duties involved assisting patients from their beds to chairs and carts, and back again. (R. 65–66). This included lifting patients who weighed up to 250 pounds. *Id.* In 1991, Vaile returned to work as a nurse's aide, but had to stop working after three days because her back gave out and she could no longer lift patients due to severe back pain. (R. 61, 65–66, 203). She visited the Family Medicine Clinic complaining of intermittent back pain. (R. 96). An examination revealed that she had full back motion. *Id.* She was diagnosed with lumbar strain. *Id.*

Vaile filed an application for SSI on December 19, 1991, with a protected filing date of October 22, 1991. (R. 34–37). Her application was initially denied on May 21, 1992 (R. 39–40), and denied on reconsideration on August 26, 1992, (R. 53). Following a hearing on January 10, 1994, Administrative Law Judge John M. Gough ("ALJ") issued a decision denying SSI benefits on May 27, 1994. (R. 14–27). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review. (R. 3–4). Vaile then filed a complaint for judicial review, pursuant to 42 U.S.C. § 405(g). The Court now considers the record in this case to determine whether the ALJ's decision is "both supported by substantial evidence and based on the proper legal criteria." *Ehrhart v. Secretary of Health and Human Services,* 969 F.2d 534, 538 (7th Cir.1992).

A. *Vaile's Testimony*

Vaile testified at the administrative hearing without the assistance of counsel or a non-attorney advocate. (R. 193). Vaile was 41 years old at the time of the hearing. (R. 195). She is five feet tall and weighs about 155 pounds. (R. 196). She did not graduate from high school, but recently earned her GED. *Id.* In 1991, she enrolled in courses at a community college but stopped attending due to headaches and back pain. (R. 88).

She lives in an apartment with her 15 year-old son. (R. 208).

Vaile was last employed in 1990, when she worked part-time for three months at a senior citizen center cleaning homes of the elderly. (R. 202–203). Before cleaning homes, Vaile was employed as a nurse's aide from at least 1983 until back pain forced her to stop working in that capacity in 1991. (R. 65–66). The back pain began in 1988 after she fell while at work. (R. 34, 96, 98, 108). She experiences pain in her lower back and in both legs. (R. 203–204). About once a week, her back "locks up"; she describes the sensation as "a shooting pain that goes up and down the legs" followed by numbness." (R. 204). For her back pain, she takes Flexeril, a muscle relaxant. (R. 198). As a result of her back pain, she sleeps poorly at night getting only three to four hours of sleep. (R. 197). Because she becomes tired each afternoon, she takes a nap for about an hour and a half. *Id.*

Vaile experiences severe headaches which have occurred each day for at least the past two years and which she attributes to a side effect of the Flexeril. (R. 198, 204–205). For relief, she takes non-prescription Tylenol, which typically alleviates the pain after a couple of hours. (R. 205). Vaile also experiences problems with her left knee, which "locks up" in cold weather and swells as a consequence of breaking it in 1991. (R. 207). She does not wear a brace or support for her back or knee. *Id.* Nor does she perform exercises for her back or knee or use assistive devices when walking. *Id.*

When asked about her abilities to perform various tasks at home, Vaile stated that she does cooking, dishes, bedmaking and dusting; her teenage son vacuums, washes floors and removes the trash. (R. 209). When climbing the stairs to her second-floor apartment, she experiences considerable back pain. *Id.* When asked to describe her daily activities, Vaile testified that she mostly reads, receives visitors and attends church services twice weekly. (R. 210–212). Once in a while, she goes out to dinner with a friend or attends church functions. (R. 212). Vaile testified that she can only sit for 20 to 30 minutes at one time and stand in one place for 15 min-

utes, at most. (R. 207). In addition, she has difficulty walking four blocks at one time. (R. 208)

## B. *Vaile's Medical Records*

### *Family Medical Clinic*

On March 4, 1991, Vaile was seen at the Family Medical Clinic. The report states she complained of intermittent back pain that she has had for several years. (R. 96). She was diagnosed as suffering from lumbar strain and was prescribed Naprosyn. *Id.*

### *Dr. Seghers*

Vaile was examined by Dr. Victor Seghers, M.D. ("Seghers") on March 31, 1992, at the Heart of Texas Cardiovascular Center in conjunction with her SSI application. (R. 98). Seghers' records result from his disability evaluation of Vaile. *Id.* Vaile reported "some pain in her low back with some pain radiating down the legs with some numbness in her legs and chronic low back pain." *Id.* Seghers' physical examination revealed a normal range of motion in her· back with no significant abnormalities. (R. 99). Examination of the lumbosacral spine showed "very early osteoarthritis with early osteophytes mostly at T10–11, otherwise normal and negative x-rays." *Id.* His impression was "very early degenerative arthritis of the LS spine." *Id.*

Upon examination of Vaile's left knee, Seghers noted "[t]he left knee is at normal with significant narrowing of the joint space and obliteration of the joint space between the tibia and the femur." *Id.* His impression was that there was an abnormal knee x-ray with some post-traumatic arthritis. *Id.* Seghers further commented that Vaile is going to school and managing quite well. *Id.*

### *Dr. Joseph*

During 1992, Vaile visited Dr. Rosamma Joseph, M.D. ("Joseph"), a neurologist. On April 20, 1992, Joseph evaluated Vaile. In reporting Vaile's history, Joseph noted the following: Vaile reported that she has had headaches "for a long time but they got significantly worse ever since she hurt her low back in 1988." (R. 112). She also experienced nausea and lightheadedness with the headaches which might result in some noise and light intolerance. *Id.* She complained of constant pain and discomfort in her lower back, but a CT scan of the lumbosacral spine was reportedly negative. *Id.*

Joseph's examination revealed the following: "low back shows increased lordosis, she was very irritable on palpation of the low back in the midline and paraspinally. No spasm was appreciated. [Range of motion] of the back was diminished to about 75% in all directions." (R. 114). His overall impressions were: "1) Chronic, recurrent headaches with features of muscle contraction headaches, most likely due to chronic stress and muscle tension. 2) Chronic low back pain referred into the legs with numbness and weakness of the legs, rule out herniation." (R. 115). Joseph advised that an exercise program and weight loss might be beneficial. *Id.*

On May 13, 1992, Joseph saw Vaile for a follow-up and re-evaluation. (R. 101). He reported that the Vaile "had an EMG nerve conduction study done including both legs and paraspinal muscles which was essentially within normal limits." (R. 101, 110–111). Joseph also reported Vaile had an MRI scan of the lumbosacral spine done at Metroplex Hospital on May 5, 1992, showing mild, diffuse spondylosis and a mild diffuse bulging disc at 3–4 level, but this did not appear to be a disc herniation. (R. 101). At the L4–5 level, "there was moderate bulging of the disc causing mild impression of the thecal sac. The nerve roots appear to be free but small amount of compression of the existing L5 root could not be ruled out." *Id.*

Joseph reported that Vaile "can do light duty, sedentary job but should preferably avoid heavy, strenuous activities to the back which may further deteriorate her condition." (R. 102.) At that time, Joseph noted that there was no evidence Vaile's condition was surgically correctable. *Id.* Since she could not take anti-inflammatory medications, he prescribed Robaxin and Pamelor for her headaches and back pain. *Id.* Joseph referred her for physical therapy for two weeks and scheduled a re-evaluation in four weeks. *Id.*

During a follow-up visit on June 11, 1992, Joseph noted that Vaile "has arthritis," and that her range of low back motion was 75 percent. (R. 125). His impressions were: 1) chronic low back pain associated with degenerative disease of the lumbosacral spine, 2) chronic left knee pain, 3) recurrent headaches with features of muscle contraction and migraine, and 4) dizziness associated with headaches. *Id.*

On April 13, 1993, Joseph completed a work prescription report. (R. 124) Joseph opined that Vaile could walk between ½ and 1 mile, sit and stand 25–50% of the time, and lift 10 to 20 pounds. *Id.* Vaile should not walk up stairs and should perform only limited bending. *Id.*

### Dr. Rudd

On February 3, 1993, M. David Rudd, Ph.D. ("Rudd"), a psychologist, assessed Vaile's general intellectual and emotional functioning, and obtained data to assist in vocational counseling and guidance. (R. 127). Vaile revealed that she was divorced and has two children; received AFDC food stamps, Medicaid, and housing support; and had been unemployed for approximately the past three years. *Id.* She was motivated for retraining or schooling and wanted to study to be a social worker. (R. 128). She operated a household, routinely sleeps approximately 8 hours a day, and "effectively engages in the full spectrum of activities required for independent living and self-sufficiency." (R. 130).

Vaile appeared to have suffered chronic depressive symptomatology of varying intensity since late adolescence. (R. 132). Intellectual and academic testing suggested limited and below average skills, indicating the need for basic skill development. *Id.* Based on his testing and evaluation, Rudd made the following recommendations: (1) adult education classes to address limited academic skill; (2) vocational and general occupational interest testing and counseling to assist in both identifying and clarifying her interests and ensuring that current interests match intellectual/academic skill level; (3) counseling to assist her in dealing with current stressors, chronic depressive symptomology, and self-image/efficacy issues; and (4) consultation with a psychiatrist to address any potential need for medication (either at present or if she experienced an acute exacerbation of reported symptomatology). *Id.*

Rudd stated that in general, Vaile appeared to be performing consistent with her assessed level of intellectual functioning. *Id.* She was highly motivated to pursue a degree in social work and would appear to possess the basic skills necessary. *Id.* However, her assessed skills are limited and below average. *Id.* Her full scale I.Q., which provides an assessment of general intelligence and general occupational and scholastic aptitude, was of 80, which placed her in the "low average" classification. (R. 131). However, she did not qualify for a formal diagnosis of a learning disability. (R. 132). Without additional assistance or tutoring, it is likely that college level work will prove too difficult for her, particularly given a somewhat rigid, perseverative approach to problem-solving. (R. 130).

### Dr. Vancura

Dr. Stephen J. Vancura, M.D., reviewed Vaile's lumbosacral MRI scan performed at Metroplex Hospital on May 5, 1992. (R. 103). Based on his evaluation, he reported indications of disc degeneration and desiccation. *Id.* He found mild degenerate facet disease at all levels. *Id.* However, he concluded that there was no disc herniation at any level. *Id.*

### C. *Vocational Expert's Testimony*

Vocational expert Dr. D. Wilson Manning ("VE") was present throughout Vaile's hearing and testified that, according to Vaile's testimony, Vaile could perform light work. (R. 216–217). The VE based his determination on a hypothetical posed by the ALJ:

> Assume . . . a younger individual with a limited education . . . with a good ability to read, write and use numbers, that the individual from a physical standpoint would be limited to work activity of a light nature, with restrictions limiting her to standing no more than 50 percent of the day, . . . sitting no more than 50 percent of the day and walking a half to one mile, that the individual would not be able to crouch,

crawl, but could occasionally bend and stoop, that as the individual were to perform such activity they might be expected to experience a mild to occasionally moderate level of symptomatology, including pain, but not such as would interfere with the performance of the work activities as I've described them. Further, ... [assume] that the full-scale score would be used, which would limit the individual to simple routine repetitive work activity, that the individual should be prohibited form working around the public ... that there would be a fair ability to work with co-workers and to respond appropriately to supervisors, ... that the work activity involved would need to be of a low-stress level, .... Now, assuming all of those factors, would such an individual be capable of performing any of the claimant's past relevant work activity?

(R. 216–217).

The VE determined that the hypothetical person was incapable of performing Vaile's past work as a nurse's aide, but was capable of performing production-type work, such as assembling and hand packaging. (R. 217–218). The VE also testified that there were hundreds of these jobs in the Waco, Texas region, and thousands in the state and national economy. (R. 218).

### APPLICABLE STANDARDS

A. *Statutory and Regulatory Framework*

Under Title XVI of the Social Security Act, a disabled person is eligible for SSI benefits if that person meets certain requirements pertaining to income. 42 U.S.C. § 1381a (1995). The Act defines "disabled" as "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." *Id.* § 1382c(a)(3)(A). A "physical or mental impairment" is further defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 1382c(a)(3)(C). A claim-

ant is under a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." *Id.* § 1382c(a)(3)(B).

Social Security regulations outline a five-step inquiry to be followed when determining whether a claimant is disabled: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment or combination of impairments severe? (3) Does the impairment meet or exceed any of the list of specific impairments that the Secretary acknowledges to be so severe as to preclude substantial gainful activity? (4) If the impairment has not been listed by the Secretary as conclusively disabling, is the claimant unable to perform his former occupation? and (5) If the claimant cannot perform the past occupation, is the claimant unable to perform other work in the national economy in light of his age, education and work experience? *See Pope v. Shalala,* 998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520.

"A negative conclusion at any step (except for step three) precludes a finding of disability. An affirmative answer at steps one, two or four leads to the next step. An affirmative answer at steps three or five results in a finding of disability." *Shields v. Sullivan,* 801 F.Supp. 151, 155 (N.D.Ill.1992). Upon reaching the fifth step, the rules in the Medical Vocational Guidelines of Regulation Part 404, Subpart P, Appendix 2 (the "Grid") must be considered. *Id.* The Grid incorporates a claimant's age, education, and work experience as well as the claimant's residual functional capacity ("RFC") to determine what work the individual is able to perform. *Id.* "RFC is expressed in terms of a claimant's maximum sustained work capacity for either 'sedentary,' 'light,' 'medium,' heavy,' or 'very heavy' work as those terms are defined by 20 C.F.R. § 404.1567." *Id.* In determining if work is available for the claimant in the

national economy, the ALJ may use a VE. 20 C.F.R. § 404.1566(e). If work is available, then a finding of not disabled must result. *See* 20 C.F.R. § 404.1566(b).

### B. *Standard of Review*

■■■ Section 405(g) of the Social Security Act provides that a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Also, "the findings of the Commissioner ... as to any fact, if supported by substantial evidence, shall be conclusive." *Id.* Thus, the function of the reviewing court is to determine if the ALJ's decision is supported by substantial evidence. Substantial evidence means " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Luna v. Shalala,* 22 F.3d 687, 689 (7th Cir.1994), (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). Consequently, a reviewing court will not "reevaluate the facts, reweigh the evidence, or substitute [its] own judgment for that of the Secretary." *Id.* at 689.

### ANALYSIS

Vaile presents five arguments, only two of which this Court need reach on review.[3] First, Vaile contends that her waiver of counsel at the administrative hearing before the ALJ was invalid, and that she did not knowingly waive her right to counsel. Second, she contends that the ALJ did not develop a full and fair administrative record. Specifically, Vaile points to medical records not contained in the administrative record. The Commissioner argues that Vaile's waiver of counsel was valid, and that even if Vaile's waiver of counsel were invalid, ALJ sufficiently developed the record such that there were no significant omissions.

---

**3.** The other arguments were that the ALJ's decision was not supported by substantial evidence, that certain credibility determinations by the ALJ were patently incorrect, and that the ALJ em-

### A. *Right to Representation*

■■■ Vaile contends that her waiver of counsel was invalid. This Court agrees. Vaile has a statutory right to counsel at her disability hearing. *See* 42 U.S.C. § 406; 20 C.F.R. § 404.1700. If properly informed of that right, however, she may waive it. *Binion v. Shalala,* 13 F.3d 243, 245 (7th Cir. 1994). To ensure a valid waiver of counsel, the Seventh Circuit requires the ALJ to explain to a pro se claimant: "(1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of the fees." *Id.; see also Thompson v. Sullivan,* 933 F.2d 581, 584 (7th Cir.1991).

In the instant case, the record reveals that the ALJ did not make any serious effort to discuss—let alone fully discuss—any of these important matters. The extent of the ALJ's conversation with Vaile concerning her right to counsel was as follows:

ALJ: Now, I see that you're here this morning without an attorney or a representative. You were advised of your right to counsel at the time of your Notice of Hearing. Do you understand that right?

CLMT: Yes

ALJ: And is it your desire to go forward at this time without the assistance of a representative or attorney?

CLMT: Yes

It is evident from the above colloquy that the ALJ did not comply with the clear dictates of *Binion* and *Thompson;* indeed, the ALJ ignored all three requirements. The importance of explaining these requirements to a claimant takes on additional significance when the claimant possesses limited education or intelligence. In such circumstances, the ALJ should explain the right to counsel and the role of an attorney in the administrative hearing in even greater detail and with increased attention toward ensuring that the claimant fully understands these

---

ployed an improper hypothetical question. In light of our decision below, it is unnecessary to reach these arguments here.

issues. *See Smith v. Secretary of Health, Educ. and Welfare,* 587 F.2d 857, 860–61 (7th Cir.1978). Here, Vaile's tenth grade education and her low average I.Q. of 80 should have apprised the ALJ that a greater explication of the role and availability of counsel was necessary. The ALJ not only failed to fulfill this increased responsibility, he failed to comply at all with the requirements articulated by the *Binion* court. In view of those requirements, the Court has no choice but to conclude that the ALJ did not provide Vaile with the information necessary to enable her to intelligently decide whether to retain counsel or proceed pro se. Accordingly, Vaile's waiver of her statutory right to counsel was invalid because it was not undertaken on a knowing and intelligent basis.

Finding that Vaile's waiver of her statutory right to counsel was invalid does not end the inquiry, however. The Court must go on to consider whether the ALJ failed to develop a full and fair record. Only if that is the case would Vaile be entitled to a remand. *See Smith,* 587 F.2d at 860; *Binion,* 13 F.3d at 245 (discussing and reaffirming *Smith* ).

### B. *Adequacy of the Record*

■ When a claimant's waiver of her right to representation is invalid, the ALJ has a heightened duty to develop a full and fair record. *Thompson,* 933 F.2d at 588. "Failure to fulfill this special duty is good cause to remand for gathering of additional evidence." *Id.* at 585. Vaile contends that remand is necessary because the ALJ failed to adequately develop the record.

■ In *Binion,* the court described the ALJ's duty to develop the record: "[t]he ALJ's duty to develop the record fully and fairly where the claimant proceeds without counsel is met if the ALJ probes the claimant for possible disabilities and uncovers all of the relevant evidence." *Binion,* 13 F.3d at 245. "[W]here the disability benefits claimant is unassisted by counsel, the ALJ has a duty 'scrupulously and conscientiously [to] probe into, inquire of and explore for all of the relevant facts.' " *Cutler v. Weinberger,* 516 F.2d 1282, 1286 (2d Cir.1975), *quoted in Smith,* 587 F.2d at 860. If a valid waiver was not obtained, the burden is on the Com-

missioner to show that the ALJ adequately developed the record. *Binion,* 13 F.3d at 245. Once the Commissioner shows that the record was developed fully and fairly, the claimant is given the opportunity to rebut this showing by demonstrating prejudice or an evidentiary gap. *Id.*

■ Having thoroughly reviewed the administrative record, the Court cannot conclude that the Commissioner has met her burden of establishing that the ALJ adequately developed the record, particularly in light of the ALJ's heightened responsibility in this case. While the Court discusses several deficiencies in the record below, the Court does not regard any one deficiency alone as necessarily sufficient to require a remand; however, viewing the deficiencies as a whole, the Court finds that the ALJ did not adequately develop the record.

Most troubling to the Court is the lack of discussion or inquiry by the ALJ of missing medical records. This omission appears particularly egregious in light of the fact that Vaile apprised the ALJ that some medical records were missing at the onset of the administrative hearing:

ALJ: Do you have any objections to Exhibits 1 through 25 being put into the record at this time?

CLMT: Well, all I know is that there's some doctor's records that are missing.

ALJ: Well, that may be. But that doesn't go to whether these documents are admissible. See, I—

CLMT: Uh-huh.

ALJ: —can't consider them unless they're admitted into the record—

CLMT: Okay.

ALJ: —formally

CLMT: All right.

ALJ: So I need to ask you first if you have any objections to any of those documents being placed into the record.

CLMT: No, uh-uh.

ALJ: All Right. Exhibits 1 through 25 will be admitted into the record at this time without objection.

ALJ: We'll get into the area of records—

CLMT: Okay.

ALJ: —as we go along. All right.

During the 37 minute hearing, however, the ALJ never returned to or discussed the missing records. The ALJ failed to query Vaile about which medical records she believed to be missing. At a minimum, the ALJ should have made this inquiry to ensure a fully developed record. *See Nash v. Shalala,* No. 93 C 5997, 1995 WL 88935, at *9–10 (N.D.Ill. Mar. 2, 1992) (ALJ's failure to inquire into missing medical records precluded a finding that ALJ developed a full and fair record). Because the ALJ did not conduct this inquiry, the ALJ could not be certain that all Vaile's medical and treatment records had been obtained. *Id.* at *9.

Although the Court is aware that "how much evidence to gather is a subject on which [courts] generally respect the Secretary's reasoned judgment," *Luna v. Shalala,* 22 F.3d 687, 692 (7th Cir.1994), the Court does not read this proposition broadly to permit an ALJ to completely disregard known sources of medical evidence. This is especially true where, as here, the ALJ has been informed of missing medical records and has the opportunity to question the claimant directly about the omissions. Missing records may produce evidentiary gaps. Prejudice may result if an ALJ fails to elicit all of the relevant information from a claimant. *Binion,* 13 F.3d at 245. In this case, the ALJ failed to sufficiently probe the facts regarding the missing records so as to satisfy the duty to present a full record.

Besides the missing records Vaile spoke of, there are additional medical records not included in the administrative record. Whether these records are the same records Vaile spoke of, contain some overlap or are entirely different, is unknown. A letter dated January 17, 1992, was sent by Disability Examiner Patricia Correll to Dr. Mark Lane, Vaile's treating physician, requesting a host of clinical diagnostic reports and evaluations since January 1990. (R. 97). These medical records were not made part of the record. Although the ALJ may have assumed that no new information would be contained in these early records, it was impossible for him know whether this assumption was correct.

The importance of clinical diagnostic reports in assessing disability is clear. In his review of the MRI scan administered on May 5, 1992, Dr. Vancura notes that "the history offered originally states that the patient has a previous lumbar CT. The patient seems to think she has only had a previous head CT. We have no previous lumbar CT examination. If there is a previous lumbar CT anywhere, I would like to know this and compare it with the current study." (R. 104). Whether a previous lumbar CT scan exists and whether Lane's records contain probative material evidence is unknown. The hearing transcript reveals that the ALJ made no inquiries concerning this information. The ALJ's duty to fully and fairly develop the record in this case requires, at the very least, that some effort be made to evaluate the relevance of these records.

In addition, records were requested from Dr. Frank Gemma ("Gemma") for 1992. (R. 121). Gemma's records were not made a part of the record nor was Vaile asked about any treatment by Gemma at the hearing. Also, on June 11, 1992, Dr. Joseph reports that Vaile was referred to Dr. Sevilla ("Sevilla") for management of back and knee pain. (R. 125). It appears that the ALJ made no effort to determine whether Sevilla had any pertinent medical records bearing on Vaile's alleged disability. Nor did the ALJ even inquire who Sevilla was or if Vaile had ever been diagnosed or treated by him. Admittedly, there is no other reference to Sevilla in the record, but this reference to Sevilla in Joseph's report seems to warrant, at the very least, some minimal inquiry into whether Sevilla evaluated Vaile. This inquiry is particularly important in light of the lack of medical records pertaining to Vaile's alleged disability after June 11, 1992. Certainly, if Vaile were seen by Sevilla, that physician's medical records might contain probative evidence.

A letter requesting medical documents was also sent to Tanya Morgan, a counselor at the Texas Rehabilitation Commission, but these records were not made part of the record. (R. 147). At the hearing, Vaile informed the ALJ that she had been evaluated by Morgan in 1993 and that Morgan told her

that a disability letter would be sent to her. (R. 213). The full discussion between the ALJ and Vaile on this point is as follows:

Q: All right, Is there anything else you can think of that I haven't asked you about that you wanted to tell me concerning your claim for disability?

A: Well, I talked to the Texas Rehab.

Q: Uh-huh.

A: And they were supposed to submit some papers.

Q: Well, as a matter of fact, we contacted Texas Rehab. And they never responded.

A: Yes. And I have talked to her, Tanya Morgan.

Q: Yes, that's—

A: And she says—

Q: —who we wrote the letter to.

A: She told me she was going to close my case out.

Q: What records is it they have that—

A: Just about them trying to send me to school and they couldn't—she told me she couldn't see that I could go to school or that I could work at the present time. And I asked her if she would send me a letter. And I have not heard from her. She said she was supposed to send a disability letter and somebody had contacted her. But she never said anything more.

Q: When did you work with TRC?

A: This past year.

Q: '93?

A: Yeah, '93.

Q: Okay. Did you go for an evaluation?

A: Yes, I did.

Q: Okay. And who did you see when you went for the evaluation?

A: You mean as far as—

Q: The TRC evaluation.

A: It was just Tonya Morgan. I dealt with her.

Q: Okay.

A: Okay.

Q: All right. Is there anything else you can think of that you wanted to tell me?

A: That's about it.

Q: Okay.

As stated, Vaile consulted and was evaluated by Morgan in 1993. (R. 213–214). According to Vaile, Morgan said Vaile could not currently attend school or work. (R. 214). Morgan also reportedly was to send Vaile a "disability letter." *Id.* Such evidence would be very pertinent to a disability analysis and require further inquiry. *Nash,* 1995 WL 88935 at *10. However, the ALJ failed to pursue this avenue of inquiry.

Based on the foregoing discussion, the court concludes that the record contains "significant omissions" that warrant remand. *See Luna,* 22 F.3d at 692; *Nash,* 1995 WL 88935 at *9. The ALJ should have taken additional steps to assure that the record was more fully and fairly developed by acquiring the missing and additional records, and exploring the medical evidence. At the very least, the ALJ should have questioned Vaile more thoroughly to elicit further information about the missing records. The fact that Vaile was not represented by counsel at the hearing is particularly significant in this respect. An attorney might have significantly assisted Vaile by questioning witnesses about her recent medical history and encouraging the ALJ to obtain the missing medical records. "Although the [ALJ] is not legally required to explicitly pass judgment on every piece of evidence, this Court believes that the better practice is to briefly address all the evidence militating in favor of a finding of disability and relied on by the applicant since it is almost inevitable that the decision ... will be appealed to the federal district court." *Cunningham v. Shalala,* 880 F.Supp. 537, 551 n. 15 (N.D.Ill.1995).

Given the inadequacies of the record already discussed and the heightened responsibility of the ALJ to develop a full and fair record in the absence of a valid waiver of counsel, the Court finds this case must be remanded for further development of the evidentiary record. Consequently, the court need not reach Vaile's additional arguments that the ALJ's decision was not supported by

substantial evidence, that certain credibility determinations by the ALJ were patently incorrect, and that the ALJ employed an improper hypothetical question.

### CONCLUSION

For the reasons stated above, the decision of the ALJ is reversed and remanded[4] for further development of the evidentiary record consistent with this opinion.

---

**4.** This is a "sentence four" remand and hence a final order under *Melkonyan v. Sullivan,* 501 U.S. 89, 97–102, 111 S.Ct. 2157, 2162–66, 115 L.Ed.2d 78 (1991).