**Albert E. SCOTT, Plaintiff,**

v.

**John J. CALLAHAN, Commissioner
of Social Security [1], Defendant.**

**No. 97 C 0001.**

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 10, 1997.

---

**1.** This action was originally styled *Scott v. Chater;* however, Commissioner Shirley S. Chater has since been succeeded by John J. Callahan, whom President Clinton appointed Acting Commissioner of Social Security effective March 1, 1997. Accordingly, we substitute John J. Callahan as defendant under Rule 25(d)(1) of the Federal Rules of Civil Procedure.

Marcie E. Goldbloom, Frederick J. Daley, Frederick J. Daley, Ltd., Chicago, IL, for Plaintiff.

Jack Donatelli, U.S. Atty.'s Office, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

■ On January 9, 1995, an Administrative Law Judge (ALJ) denied Albert Scott's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act, 42 U.S.C. §§ 416(i), 423(d), 1381a, 1382c(a)(3)(A). He now appeals that decision in federal district court as permitted by 42 U.S.C. § 405(g), which grants federal courts the power to review the Social Security Commissioner's final decisions [2] via a federal civil action. The accepted procedural vehicle for obtaining judicial review of a social security benefits determination is a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, which both Scott and the Commissioner have submitted here.[3] For the reasons that follow, we affirm the ALJ's decision.

### RELEVANT FACTS

We begin with a brief overview of the facts, then move on to a more detailed discussion of the record. At the time of the hearing in November 1994, Scott was forty-eight years old, living with his wife in a first floor apartment. He has a ninth grade education and can read and write. For ten years, he worked steadily as a truck driver delivering produce until he was fired in March 1991 for allegedly padding his hours. Before that, Scott spent eight years in prison. He has not been arrested since.

Scott has been plagued with hypertension for years. He takes medication that lowers, but does not alleviate, his high blood pressure. At five foot seven and 239 pounds, he also suffers from obesity. Scott's heart is enlarged, and doctors have observed a "spot" on Scott's chest X-rays. These conditions are monitored by Scott's treating physician, Dr. Dizon, whom Scott sees at least once per month. Scott was hospitalized for uncontrollable hypertension and related complications in February 1990, September 1990, and May 1992; the most recent hospitalization was precipitated by an attack of congestive heart failure.[4] Each time Scott was admitted, doctors noted that Scott had stopped taking his medication. Administering medication consistently improved Scott's condition, and he was always discharged with medication and instructions to follow a low-salt diet.

Scott protectively filed for DIB and SSI benefits on October 8, 1991. He alleged a disability onset date of July 30, 1991, claiming that uncontrollable high blood pressure and an enlarged heart precluded employment. The onset date's significance is unclear, however, since it does not coincide with any documented health problem and Scott had stopped working four months earlier for

2. Before filing this action, Scott pursued his claim through administrative channels, requesting that the Appeals Council review the ALJ's decision. See 20 C.F.R. § 404.967 (party dissatisfied with hearing decision may ask the Appeals Council to review it). When the Appeals Council denied review, the ALJ's ruling became the Commissioner's final decision. Luna v. Shalala, 22 F.3d 687, 689 (7th Cir.1994); see 20 C.F.R. § 404.981. We therefore refer to the ALJ and the Commissioner interchangeably.

3. Although both parties have moved for summary judgment, we do not apply the familiar summary judgment standard of "genuine issue of material fact" employed under Rule 56. When a district court reviews an individual social security case, the court's review is limited to a determination of whether the record contains substantial evidence to support the agency's decision, and whether

the agency applied the proper legal standards. See Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1501 (10th Cir.1992) (Kane, J., concurring); Ehrhart v. Secretary of Health & Human Servs., 969 F.2d 534, 538 (7th Cir.1992). Essentially, we treat Johnson's motion for summary judgment as a motion for an order reversing the Commissioner's decision and the Commissioner's motion as one for an order affirming his decision. See Garcia v. Califano, 463 F.Supp. 1098, 1100–01 (N.D.Ill.1979).

4. Scott was hospitalized on three more occasions during this time for reasons unrelated to his hypertension and heart condition: in March 1990 he was treated for kidney stone removal; in April 1990 he underwent a penile implant procedure; and in January 1991 he was admitted to the hospital following a car accident.

reasons unrelated to his health. The Social Security Administration ("SSA") denied both claims on December 19, 1991, and Scott declined to pursue them further.

Scott then filed a second application for both SSI and DIB on June 24, 1992, alleging the same disability onset date and impairments, as well as a "spot on [his] chest." The SSA denied these applications on October 23, 1992. Scott's request for reconsideration was denied on July 19, 1993, and on August 2 he requested a hearing before an ALJ. The hearing was held on November 2, 1994; Scott was unrepresented. Upon considering both Scott's October 1991 and June 1992 applications for benefits, the ALJ denied them in a written opinion issued January 19, 1995. He found that although Scott suffered from a severe impairment—hypertension with status-post congestive heart failure—which prevented him from returning to his previous occupation, it left him with the residual functional capacity ("RFC") to perform sedentary work available in the national economy. Consequently, the ALJ ruled that Scott was not disabled. Scott next hired an attorney and petitioned the Appeals Council to review the ALJ's decision. His petition was denied on November 15, 1996.

On January 2, 1997, Scott filed a complaint for judicial review in this Court. His contentions are twofold: 1) Scott did not validly waive his right to representation before the ALJ, who subsequently failed his duty to develop the record in light of Scott's unrepresented status; and 2) the ALJ's decision is not supported by substantial evidence and contains legal error. We now consider the record to determine the validity of Scott's assessment.

## I. Scott's Testimony

Scott was the sole witness at the hearing. Before taking Scott's testimony, the ALJ began with a few preliminary matters. First, he mentioned Scott's right to representation:

Q: You also have the right to have an attorney or other representative represent you if you wish. An attorney or representative will assist you in preparing your case and will help you in developing the case, and assist you in answering any questions or asking additional questions other than the ones I may ask. Some of them don't charge a fee at all. Some of them work on a contingency fee; they don't charge you unless they collect anything. So it's up to you whether or not you want them or not. You have that right if you desire. What do you wish to do, sir?

A: Well, I can continue on myself.

Q: All right, sir. That's up to you.

(R.41). Second, the ALJ turned to new allegations in Scott's August 1993 hearing request. In addition to the physical impairments listed in Scott's 1991 and 1992 applications, the hearing request claimed for the first time that Scott was suffering memory loss, nervousness, and an unwillingness to be around people and attend to his hygiene. In response to the ALJ's question about the status of these problems, Scott answered, "Well, I'm a little better now...." *Id.* Asked whether his doctor had recommended psychiatric treatment or prescribed "mental medication· of any kind," Scott replied in the negative. The ALJ did not probe further. Finally, the ALJ noted the exhibits he had on file and questioned whether Scott had any additional evidence to offer. Scott responded that he did not.

Scott testified that he was 48 years old, 5 feet 7 inches tall, and 239 pounds—up 14 pounds in the previous six months. He lives with his wife in a first-floor apartment. His education ended in the ninth grade, and he is capable of reading and writing. On the day of the hearing, Scott arrived by way of public transportation, and walked three or four blocks to the hearing from the bus stop. He had to slow his pace, but did not stop for any reason other than to obey traffic lights.

From 1981 to 1991 Scott worked as a truck driver for various companies, always delivering produce.[5] The job required heavy lifting;

---

5. From what the Court can tell, this was Scott's first job. Before working as a truck driver, Scott had been in prison for eight years.

at times, Scott shouldered weights of over 100 pounds. His most recent employer dismissed him in March 1991 for alleged dishonesty regarding work hours. Afterward, Scott received unemployment compensation for about a year. On this subject, the ALJ commented: "So you realize that when you draw unemployment you have to say that you're ready, willing and able to work." (R.47) Scott replied that he understood this. In the summer of 1992, Scott worked a temporary job (a few weeks) as a driver for the Chicago Housing Authority.

Scott attributes his inability to work partly to uncontrollable high blood pressure. The ALJ asked what about Scott's condition started to preclude work on the disability onset date:

Q: Why, since March of '91,[6] sir, when you say you've been unable to work, does your blood pressure prevent you from working?

A: Because my blood pressure elevates and it goes up, you know, and the medicine they take—that they gives me—

Q: Uh-huh.

A: —and I have to just, you know—it makes me (INAUDIBLE) and everything. I can't, you know—I have

Q: I see you're taking Lopressor and Procardia for your blood pressure.... Does that control your blood pressure?

 * * * * * *

A: It helps, yeah.

Q: Yes, it does help. Does it help or does it control the pressure?

A: It helps it. It doesn't control it ....

(R.50). Scott clarified that his medication lowers his blood pressure, but not to the point that it becomes normal. The ALJ asked again:

Q: How does that prevent you from working though?

A: Because it don't—it elevates on me. Sometimes my blood pressure—

Q: Well, how does your high blood pressure prevent you from working? The fact that your pressure's high ... why does that prevent you from working?

A: Because the doctor said I might pass out, anything ....

(R.50–51). Since 1990, Scott has passed out a total of four times: twice over the last two years he was employed, and twice since.

The ALJ moved onto Scott's second ground for benefits—an enlarged heart and spot on his chest:

Q: You also say, sir, that you have an enlarged heart and a spot on your chest. How does that prevent you from working, sir?

A: Well, my enlarged heart, the doctor said that causes swelling in my legs and joints—

(R.52) Scott told the ALJ that his legs and joints were swollen most of the time, including that day. He explained that he was taking medication to alleviate the swelling and that it "sometimes" worked. Scott told the ALJ that he was able to take the medications prescribed for his conditions.

Scott last saw his treating doctor, Dr. Dizon, for his heart and blood pressure maladies three months earlier, in August 1994. Generally, Scott sees Dr. Dizon about once or twice a month. When asked whether his condition had changed since May 1993, the date Dr. Dizon submitted a written report to the Bureau of Disability Determination Services, Scott stated that his condition was the same. He has not been hospitalized since May 1992.

After questioning Scott about his impairments, the ALJ proceeded to question him about his physical limitations and daily activities. Scott testified that he can stand for about thirty minutes at a time. He goes outside just about every day, at least to take

---

6. Scott's second application, dated June 24, 1992, alleges inconsistent disability onset dates. In the space asking "[w]hen did your condition first bother you," Scott wrote 7/30/91. But a few lines down, Scott answered the question "[w]hen did your condition finally make you stop working" with the date of March 3, 1991, the day he was fired. (R.200)

the garbage out, which is a half-block walk. Once or twice a week, Scott goes to the store, about a block-and-a-half from home. The three or four blocks Scott traversed to the hearing was the farthest Scott had walked since summertime, and even during that time, he walked a comparable distance only once. The ALJ next inquired whether Scott could sit "all right," to which Scott responded, "Yeah, I can sit." Scott's ability to lift, however, is reportedly limited: he avoids picking up grocery bags weighing over five pounds, and the most weight he can regularly lift with both hands is twenty pounds. Finally, the ALJ asked Scott to raise his hands over his head and wiggle his fingers, a task Scott performed successfully.

Scott's daily activities consist of watching television and a bit of reading. He is able to concentrate on television or radio programs if he sits close enough. Since March 1991, Scott has not engaged in activities such as hunting, fishing or bowling, and he has no hobbies. He does not go to movies, bars, games or other events. He visits friends and relatives on holidays. Scott does undertake household chores, including cleaning, vacuuming, making the bed, and cooking small meals. He feeds, dresses, and bathes himself daily. Scott rarely drives, although he does ride as a passenger, and, in fact, took an eight-hour car trip to Memphis with his brother in July 1994.

The ALJ wrapped up the hearing by asking Scott whether he had anything else he wanted the ALJ to consider in deciding his case. Scott mentioned frequent urination and a consequent lack of sleep that resulted from ingesting prescribed medication, as well as difficulty bending his legs from time to time. The ALJ then closed the hearing, which had lasted one hour and ten minutes.

## II. Medical Records

The record contains a variety of documents relating to Scott's hospitalizations, as well as a few reports from Dr. Dizon and another treating physician, Dr. Courtney.

### A. Hospital Records

Scott was first admitted to Thorek Hospital on February 17, 1990 for uncontrolled hypertension and acute ventricular failure. His blood pressure on admission was 230/60. Doctors observed that before admission, Scott had not been taking any medication, and that he had been suffering nocturnal dyspnea since 1989. An echocardiogram performed February 21 revealed mild concentric left ventricular hypertrophy, mild left ventricular dysfunction, and mild left atrial enlargement. Scott was put on a variety of medications, including Lasix, Procardia, Vasotec, Lonitren, Lanoxin and Lopressor, which slowly improved his blood pressure. Scott was discharged on February 28, with the following instructions: increase activity; eat a low sodium diet; and continue a regimen of medication consisting of Lonitren, Lasix, Lanoxin, Vasotec, and Lopressor.

Documents from Scott's hospitalizations in March 1990 for kidney stone removal and in April 1990 for a penile implant note a history of severe hypertension. These two admissions were unrelated to his blood pressure or heart conditions.

In September 1990, Scott passed out, fell and hit his elbow, and was again admitted to Thorek. His principal diagnosis was uncontrolled hypertension, with a blood pressure reading of 220/120. Doctors observed that Scott had been "noncomplaint with medications." (R.99) He told one doctor that he "ran out of meds and hasn't taken any for 5 weeks." (R. 101) An EKG and echocardiogram revealed moderate left ventricular hypertrophy with strain, mild left atrial and ventricular enlargement, and mild left ventricular dysfunction. A combination of medications and a low salt diet produced "progressive improvement," and Scott was home after four days. The discharge summary states that Scott was discharged with "improved control of the blood pressure," and instructions to follow a low-salt diet and to take his medication, which included Lasix, Slow–K, Digoxin, Aldomet, Prinvil and Loniten. (R. 100)

A car accident in January 1991 brought Scott to Oak Park Hospital. He was treated for cervical low back sprain resulting from the accident; in addition, a radiology consultation showed "minor degenerative disease"

in the spine. No one recommended follow-up on this latter finding.

Routine chest X-rays conducted at Oak Park Hospital in December 1991 showed borderline cardiomegaly and prominence of the right hilum. Scott's radiologist opined that "[t]his may all be vascular, however, I cannot rule out a hilar mass and would suggest a CT Scan of the chest." (R.269) A CT Scan was conducted in January 1992 to investigate this "spot" in Scott's chest X-ray, and it confirmed that the prominence of the right hilum was vascular in origin. Scott was advised to undergo a CAT scan, but never did so. (R.250).

Scott suffered congestive heart failure in May 1992 and was admitted to West Suburban Hospital Medical Center for two days. His secondary diagnosis was hypertension. He had stopped taking his medication two weeks earlier because "he was unable to obtain them at the pharmacy since he recently lost his job." (R.218) While driving the night before, Scott suddenly experienced shortness of breath and arrived at the emergency room in full congestive heart failure. Progress notes indicate that Scott had been in and out of Oak Park Hospital since 1985 for hypertension treatment, and the discharge summary reports a history of severe hypertension and congestive heart failure. Physical examinations on May 24th found cardiogenic wheezing and peripheral edema, although the edema had disappeared by the 25th. (R.227) Chest X-rays revealed cardiomegaly and vascular prominence on May 24th, and localized pleural thickening on May 26th, prompting the radiologist to inquire whether Scott had "any known rib trauma?" (R.246) With medication, Scott's hypertension improved. Lasix was administered intravenously and Scott did "very, very well" on it. He switched to oral medication on the 25th and was discharged on the 26th with instructions to follow a low fat, low sodium diet and take his prescribed medications, which included Vaso–Tec, Procardia, Lasix and K–Dur.

Scott's most recent medical records are from May and June 1993. On May 17, 1993, Dr. Akhtar of Oak Park Hospital performed an EKG of Scott's heart, which showed left anterior fascicular block, left ventricular hypertrophy with repolarizing abnormality, and possible lateral wall ischemia. A chest X-ray taken the same day contained indications of dyspnea and findings compatible with pneumonia. Scott was not hospitalized, nor did any doctor recommend follow-up on these findings.

**B. Reports from Treating Physicians**

The record contains two reports from Scott's treating physician, Dr. Dizon, submitted in response to inquiries from the State Bureau of Disability Determination Services. The first, dated September 10, 1992, reports that Dr. Dizon had last seen Scott on June 23, 1992, about one month after he was hospitalized for congestive heart failure. By June, Scott was stable and not in congestive heart failure. He exhibited no pulmonary edema, dyspnea or hepatomegaly. Scott showed signs of "slight" peripheral edema and "some" cardiomegaly. Although his blood pressure on November 21, 1991 was 200/100, it had fallen to 160/100 by June 23, 1992. Scott was currently taking a variety of medications: Lopressor, Procardia, Lasix, and K Preparation. The second document from Dr. Dizon is a Cardiac Report submitted to the Bureau dated May 22, 1993, reflecting an examination on May 15, 1993. Dr. Dizon diagnosed Scott with hypertension and obesity, and reported that over the past three months, Scott's blood pressure remained a consistent 170/100. The May 1993 exam found signs of cardiomegaly, pulmonary edema, peripheral edema, and dyspnea related to cardiac disease. Scott was taking Lasix, K Dur, Lopressor, and Procardia for these conditions. Significantly, the form asked Dr. Dizon to "describe the patient's ability to do work-related activities such as sitting, standing, moving about, lifting, carrying, handling objects, hearing, speaking, traveling." Dr. Dizon answered, "Pt. can do all of above." Appended to the Cardiac Report is an Arthritic Report, on which Dr. Dizon made the sole comment, "No arthritis."

One month later, on June 22, 1993, the State Bureau of Disability Determination Services obtained a report from a Dr. Cort-

ney [7] of Oak Park Hospital. Dr. Cortney had reviewed Scott's May 1993 X-ray indicating dyspnea and findings compatible with pneumonia. He interpreted the X-ray as showing an air space between Scott's heart and spine, and noted that "this man has lungs and chest compatible with emphysema. Because of this, his lung capacity is greater." (R.259) Dr. Cortney did not recommend follow-up, nor did he state that Scott's condition necessitated any functional restrictions.

### III. Scott's Applications for Benefits and RFC Assessments by Agency Expert

The last group of documents in the record relate to Scott's alleged functional restrictions. They consist of his self-reports in disability applications and RFC Assessments by an agency-retained expert.

Scott's first application for benefits dated October 11, 1991 includes a Vocational Report, in which Scott reported feeling dizzy and short of breath when driving on the job. He stated that his feet swell, his blood pressure escalates to 240/160, and that he has passed out twice at work. In a Disability Report filed along with the application, Scott recounted feeling out of breath after walking a half-block, experiencing black-outs and swelling in his legs, and stated that "my doctors tell me it's too dangerous for me to work under these conditions." (R.90) His reported activities include some housework, making the beds, cooking small meals, and vacuuming. He admitted that he drives, but not very often. Scott's second application, filed June 24, 1992, is to the same effect, alleging that he passes out, is short-winded, cannot walk far, cannot lift much, and has been in and out of the hospital. He claimed that his doctor told him to cut back on activities, to stop smoking and drinking, to be careful when walking up stairs, and not to drive alone.

After the second application was denied, Scott filed a Reconsideration Report dated December 21, 1992, where he stated that his condition had changed: his legs, feet, joints, and hands swell, and he has trouble gripping things; he can't work, can't walk or drive a long distance, needs help putting on clothes, and has problems breathing. Scott's August 2, 1993 request for a hearing before the ALJ added claims of memory loss, nervousness, and not wanting to be around other people or maintain his hygiene. In addition to hypertension, Scott added depression as an alleged disability. Finally, in a form labeled "Claimant's Recent Medical Treatment" that Scott submitted on November 1, 1994, Scott reported that he "can't walk a block without getting out of breath from emphysema," that his legs and feet swell, he can't bend his legs, and that he suffers from memory loss in addition to his hypertension and enlarged heart.

The record also contains two Residual Functional Capacity Assessments completed by Dr. Adrian Feinerman, a medical consultant retained by the SSA. The first is dated September 17, 1992. Dr. Feinerman lists congestive heart failure and high blood pressure as Scott's primary and secondary diagnoses. Based on all the evidence in the file, Dr. Feinerman opined that Scott is capable of lifting up to ten pounds on a regular basis, can stand and/or walk for at least two hours in an eight-hour workday, can sit about six of those eight hours, and has an unlimited capacity to push and pull. Scott has no postural, manipulative, visual, communicative, or environmental limitations; in other words, Scott's only limitations are exertional. The second RFC assessment, dated June 26, 1993, contains exactly the same conclusions.

## LEGAL STANDARDS

### I. Statutory and Regulatory Framework

To receive benefits, a SSI or DIB claimant must be "disabled" as defined by the Social Security Act. An individual is disabled if he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months...." 42 U.S.C. §§ *416(i); see id.* §§ 423(d)(2)(A), 1382c(a)(3)(B). A "physical

---

7. The record refers variously to a Dr. Cortney and a Dr. Courtney. It is clear that they are the same person; much less apparent is the proper spelling of his name.

or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* §§ 423(d)(3), 1382c(a)(3)(C). A claimant is under a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).

Social Security regulations delineate a five-step process for determining whether a claimant is disabled: (1) Is the claimant unemployed? (2) Is the claimant's impairment or combination of impairments severe? (3) Does the impairment meet or exceed any of the specific impairments that the Social Security Administration lists as so severe that they preclude substantial gainful activity? (4) If the impairment has not been listed as conclusively disabling, does it nevertheless prevent the claimant from performing his former job? and (5) If the claimant cannot perform his past work, is he unable to perform other work in the national economy in light of his age, education, and work experience? *See* 20 C.F.R. §§ 404.1520, 416.920; *Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993). "An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops inquiry and leads to a determination that the claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n. 2 (7th Cir. 1985) (citation omitted).

If the claimant survives the first four steps to reach the fifth, the rules in the Medical Vocational Guidelines of Regulation Part 404, Subpart P, Appendix 2 ("the Grid") must be considered. *Shields v. Sullivan*, 801 F.Supp. 151, 155 (N.D.Ill.1992). The Grid incorporates a claimant's age, education, and work experience, as well as the claimant's residual functional capacity ("RFC") in determining what work he is able to perform. *Id.* "RFC is expressed in terms of a claimant's maximum sustained work capacity for either 'sedentary,' 'light,' 'medium,' 'heavy,' or 'very heavy,' work as those terms are defined by 20 C.F.R. § 404.1567." *Id; see* 20 C.F.R. § 416.967. In assessing whether work is available for the claimant in the national economy, the ALJ may use a vocational expert (VE). 20 C.F.R. §§ 404.1566(e), 416.966(e). If the work that the Grid suggests the claimant can perform is available, then a finding of not disabled must follow. *See* 20 C.F.R. §§ 404.1566(b), 416.966(b).

## II. Standard of Review

Section 405(g) of the Social Security Act provides that a district court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). On appeal, "the findings of the Commissioner ... as to any fact, if supported by substantial evidence, shall be [considered] conclusive." *Id.* The resulting review is limited. *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir.1995). The ALJ's decision will be affirmed if supported by substantial evidence. *Id.* "Although a mere scintilla of proof will not suffice to uphold the [ALJ's] findings, the standard of substantial evidence requires no more that 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). A reviewing court may not "re-evaluate the facts, reweigh the evidence, or substitute its own judgment" for the Commissioner's. *Luna*, 22 F.3d at 687.

## ANALYSIS

## I. The ALJ's Opinion

The ALJ determined that Scott is not disabled because his impairments leave him with the RFC to perform sedentary work that is available in the national economy. In reaching this conclusion, the ALJ performed the five-step analysis required by SSA regulations. First, the ALJ found that Scott had

not performed substantial gainful activity since the alleged disability onset date, which the ALJ considered to be March 3, 1991. Second, he determined that Scott suffers from a severe impairment—hypertension with status post-congestive heart failure. This impairment was found not to meet or equal any condition listed in SSA regulations as conclusively disabling; nevertheless, it prevented Scott from performing his past relevant work as a produce driver and delivery person. Because Scott passed the first four steps in the inquiry without resolution, the ALJ was next required to decide whether Scott could perform other work in the national economy as dictated by the SSA Grid.

In making a determination using the Grid, the ALJ considered Scott's age, education, work experience, and RFC. Scott was then 48 years old, defined as a "younger individual." He stayed in school through the ninth grade, and testified that he could read and write. Scott's ten-year job as a truck driver for a produce company required him to lift up to 100 pounds, which the ALJ classified as semi-skilled, heavy work. The ALJ noted that Scott was fired because he was accused of "padding his hours" and that Scott subsequently received unemployment compensation for one year, signing a notice pledging his readiness, willingness, and ability to work. According to the ALJ, these facts "indicate[ ] that he was ready, willing and able to work" during this time period. In addition, the ALJ pointed out that Scott held a temporary truck driving job for two weeks in 1992.

Moving on to Scott's RFC, the ALJ summarized the record evidence relating to Scott's impairment and functional restrictions. He mentioned Scott's high blood pressure, problem with passing out, enlarged heart, spot on his heart, and complaints about swollen joints. He described the events and test results relating to Scott's most recent hospitalization for congestive heart failure and hypertension in May 1992, his current regimen of medications and their effect, Dr. Dizon's June 1992 and May 1993 examinations and findings, and Dr. Cortney's interpretation of Scott's chest X-ray. Scott's testimony revealed that he

is able to ambulate with no problem and can walk up to four blocks. He has no problem sitting and is able to lift 20 pounds. He has no difficulties with reaching above shoulder level. He has no difficulty concentrating and his appetite is fine. He does not sleep well because he has to get up often to urinate. He bathed, fed and dressed himself each day. He can kneel, crawl and balance. He shops, cooks, vacuums and makes the bed. He drives a little and testified that he took an eight-hour car trip to Memphis in July 1994. (R.25) In assessing Scott's self-reported limitations, the ALJ observed that he was required under 20 C.F.R. §§ 404.1529 and 416.929 to consider the location, nature, intensity and duration of any alleged pain, as well as Scott's medication, treatment and resultant functional limitation. Under this analysis, Scott could not be considered disabled "unless medical signs and findings show that there is a medical condition that could be reasonably expected to produce the symptoms." (R.25)

The ALJ found that the medical evidence did not support Scott's allegation that his impairments preclude all work activity. As such, Scott's claims of disability were not credible. First, Dr. Dizon had opined in May 1993 that Scott's diagnosed hypertension and obesity left him able to do work-related activities such as sitting, standing, and moving about. He did not diagnose arthritis or any other condition that supported Scott's complaint about swollen joints. Scott testified that he sees Dr. Dizon once per month, and that his condition has remained the same since Dr. Dizon's May 1993 examination. The other evidence from a treating physician, Dr. Cortney's X-ray interpretation, described no problems other than "big lungs." (R.26) Second, Scott admitted receiving unemployment compensation after March 1991, which "indicates that he was able to work at that time." (R.26) While Scott's temporary job in 1992 might not be considered substantial gainful activity, "it does show that he was able to perform substantial gainful activity." (R.26) Third, Scott's testimony about his daily activities and functional limitations indicat-

ed that he could perform "light exertional activities." For example, he testified that he can walk up to four blocks, has no problems sitting, goes shopping, cooks, vacuums and makes beds, and took an eight-hour car trip in July 1994 with no apparent difficulties. Finally, the ALJ stated that "[b]ased on the medical evidence, the claimant can perform sedentary work, for example, lift 10 pounds and sit or stand and walk at least two hours in an eight-hour day on a sustained basis." (R.26–27)

In light of all this evidence, the ALJ determined that "the claimant's complaints to the degree alleged, are not credible. They are not reasonably related to the signs, findings and abnormalities and are not consistent with his own testimonial appearance and demeanor." (R.26) Rather, the evidence demonstrated that Scott has a RFC that permits him to perform sedentary work.

Because Scott could not return to his past relevant work, however, the burden shifted to the Secretary to prove that other jobs consistent with Scott's impairments, symptoms, functional limitations, age, education, work experience, and skills existed in significant numbers in the national economy, as determined by the Grid. Considering these factors along with the finding that Scott could perform sedentary exertional work, the Grid (specifically, Rule 201.19 in Table 1 of Appendix 2, Subpart P, Regulation No. 4) directed a conclusion that Scott is not disabled. For a number of reasons, Scott asks this Court to reverse this determination or remand the case for additional evidentiary development.

## II. Scott's Statutory Right to Representation

 First, Scott argues that we should remand this case because the ALJ failed to develop the record adequately in light of the fact that Scott was unrepresented. Scott has a statutory right to representation at his disability hearing. 42 U.S.C. § 406; 20 C.F.R. § 404.1700; *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir.1994). If properly informed of that right, however, he may waive it. *Binion*, 13 F.3d at 245. To ensure a valid waiver, the Seventh Circuit requires the ALJ to explain to a pro se claimant: "(1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of the fees." *Id.; see also Thompson v. Sullivan*, 933 F.2d 581, 584 (7th Cir. 1991). When a claimant's waiver of the right to representation is invalid, the burden is on the Commissioner to prove that the ALJ discharged his heightened duty to develop the record. *Binion*, 13 F.3d at 245. "Failure to fulfill this special duty is good cause to remand for gathering of additional evidence." *Id.* at 585. If the Commissioner meets his burden of proving that the record was developed fully and fairly, the claimant is given the opportunity to rebut this showing by demonstrating prejudice or an evidentiary gap. *Binion*, 13 F.3d at 245.

### A. The Validity of Scott's Waiver

Scott contends that he did not validly waive representation because the ALJ never informed him that attorneys' fees are limited to 25% of past due benefits and are subject to the ALJ's approval. Scott is correct that the ALJ did not discuss this issue. Rather, he simply told Scott about his right to representation, the tactical advantages of securing a representative, and the possibility of free representation or representation on a contingency basis (along with defining contingent representation). Likewise, a letter acknowledging receipt of Scott's request for a hearing, dated October 19, 1993, mentioned only that Scott could "choose" to be represented by a lawyer or other representative, that some lawyers charge a fee only if the claimant receives benefits, that some organizations might be able to represent Scott free of charge, and that SSA must approve any representative fee collected. The letter neglected to point out the 25% cap on fees.

In *Thompson v. Sullivan*, the Seventh Circuit emphasized the importance of explaining the 25% representative fee limitation in order to ensure a valid waiver, particularly "in disability cases where shortage of funds is likely to be an issue for the claimants." 933 F.2d at 584. Like Scott, the claimant in

*Thompson* received a letter detailing his right to representation and the possibility of obtaining it free of charge or on a contingent basis, but omitting discussion of the 25% fee limitation. The ALJ's explanation of the claimant's right to representation, however, was far more cursory than in this case; he failed to tell the claimant about any of the benefits representation might bring, or about free or contingent representation. 933 F.2d at 585 ("The dialogue regarding counsel also evidences the ALJ's failure to fully discuss the benefits of legal representation or the possibility of contingency arrangements.") Moreover, the claimant's dialogue with the ALJ, combined with the fact that he attempted to get an attorney through legal aid, "strongly suggest[ed]" that he wanted representation but thought that he could not afford it. *Id.* Here, in contrast, Scott expressed a desire to "continue on myself" after the ALJ clearly explained that free representation was an option. Consequently, a number of factors distinguish this case from *Thompson.* We are not denying that money is an issue for Scott; indeed, it likely is given that Scott has been unemployed since 1991. Our determination is simply that the ALJ and Scott's exchange makes it far more likely that Scott understood the possibility of free representation and validly waived it. *See Husbands v. Chater,* 1996 WL 153879, at \*2 (N.D.Ill. Apr.1, 1996) (finding valid waiver where plaintiff indicated that he understood the possibility of free representation because "information about an attorney who would take only limited fees would have been unlikely to alter plaintiff's decision").

### B. The ALJ's Duty to Develop the Record

■ We need not definitively resolve the waiver issue, however, because we find that the Commissioner has met his burden of proving that the ALJ developed the record fully and fairly. "The ALJ's duty to develop the record fully and fairly where the claimant proceeds without counsel is met if the ALJ probes the claimant for possible disabilities and uncovers all of the relevant evidence." *Binion,* 13 F.3d at 245. Scott argues that the ALJ's factual probing is deficient in two respects: 1) the ALJ did not assist Scott in

getting updated information from Dr. Dizon "even though the last contact that the SSA had with Dr. Dizon was 2 years before the ALJ's decision"; and 2) the ALJ failed to inquire further into Scott's alleged memory loss, nervousness, and unwillingness to be around people, difficulties which "would affect Plaintiff's ability to perform the mental demands of work." Pl. Br. at 6. Neither argument has merit.

■ In *Luna v. Shalala,* 22 F.3d 687 (7th Cir.1994), the Seventh Circuit squarely rejected the contention that SSA regulations require the ALJ to "update objective medical evidence to the time of [the] hearing." *Id.* at 693. The ALJ discharges his duty to develop a complete medical history if he obtains records from the claimant's medical sources for at least twelve months preceding the date that the claimant files for benefits. *Id.; see* 20 C.F.R. § 404.1512(d). Here, the ALJ did just that. Scott filed for DIB and SSI benefits most recently in June 1992. The record contains extensive documentation from Scott's hospitalizations between February 1990 and May 1992, the last time Scott was hospitalized. Results of an EKG and chest X-ray taken in May 1993—almost a year after Scott filed for benefits—are also included. As for information from Dr. Dizon, the ALJ obtained two reports dated September 1992 and May 1993, in which Dr. Dizon described Scott's diagnoses, symptoms, and medications, as well as rendered an opinion on functional restrictions. Moreover, the ALJ secured Scott's records from Oak Park hospital, where Dr. Dizon works as an attending physician, dating from 1991 to May 1993. Given these facts, the ALJ exceeded the requirements for compiling a complete medical history. This is especially true given that Scott told the ALJ that his condition had not changed since Dr. Dizon submitted his report in May 1993.

Scott nevertheless insists that, given the time lag between Dr. Dizon's latest report and the hearing (one year and four months), the ALJ should at least have recontacted Dr. Dizon or ordered a consultative examination. But the ALJ need only recontact a treating physician when the treating physician's evidence does not provide an adequate basis for

a disability determination. 20 C.F.R. § 404.1512(e). Dr. Dizon's reports provided such a basis. The ALJ had before him two reports post-dating Scott's benefits filing from a physician who had monthly contact with Scott and extensive knowledge of his condition. These reports contain Dr. Dizon's diagnoses of hypertension and obesity, examination results (e.g., no pulmonary edema, dyspnea; slight peripheral edema and some cardiomegaly), blood pressure over time, medications, and an opinion about how Scott's condition affected his ability to engage in work-type activities. Consequently, Dr. Dizon's reports meet SSA requirements: "Medical reports should include—(1) Medical history; (2) Clinical findings (such as the results of physical or mental status examinations); (3) Laboratory findings (such as blood pressure, x-rays); (4) Diagnosis (statement of disease or injury based on its signs and symptoms); (5) Treatment prescribed; (6) A statement about what you can still do despite your impairment(s)...." 20 C.F.R. § 404.1513(b). And they are "complete" in that the information in them allowed the ALJ to determine the effects of Scott's impairments and his ability to do work-related activities. *Id.* 404.1513(d).[8] Because these reports meet regulatory dictates and because Scott fails to point out anything about these reports that would render them inadequate, we cannot say that the ALJ was under a duty to recontact Dr. Dizon. Likewise, it was unnecessary for the ALJ to order a consultative examination because the record contained enough evidence to support a disability determination. *See* 20 C.F.R. § 404.1519a(b).

8. For a report to be "complete," it must also enable the ALJ to assess the "probable duration" of the claimant's impairment. We conclude that the hospital records established Scott's medical history sufficiently for the ALJ to make this determination.

9. In his reply brief, Scott argues that these allegations should have prompted the ALJ to order a consultative examination because "as a primary care physician, Dr. Dizon may not have been qualified to diagnose a mental impairment." Reply at 6. In support of this proposition, Scott cites *Wilder v. Chater,* 64 F.3d 335, 337 (7th Cir.1995). But *Wilder* is wholly inapposite. In

■ Nor did the ALJ fail to probe sufficiently for evidence of a mental impairment, as Scott maintains. Proof of a mental impairment must be established "by medical evidence, consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 404.1508. Here, we have only Scott's subjective allegations in his hearing request— statements from which he retreated at the hearing and which were omitted from both his applications for disability benefits—that he is experiencing memory loss, nervousness, and not wanting to be around other people or maintain his hygiene. Nowhere are these statements substantiated by medical evidence. This fact was driven home by the ALJ's questioning: Scott admitted that Dr. Dizon, whom he was still seeing at the time of the hearing, had never recommended psychiatric treatment or prescribed psychiatric medication of any kind. "Although the ALJ has an obligation to develop a full and fair record, it was [the claimant's] responsibility to provide medical evidence of a mental impairment." *Webb v. Shalala,* 1994 WL 11652, at *4 (N.D.Ill. Jan.6, 1994) (citing 20 C.F.R. §§ 404.1514, 404.1508). The unsupported statements in Scott's hearing request do not satisfy this requirement.[9]

The Seventh Circuit has announced that "a significant omission is usually required before this court will find that the [Commissioner] failed to assist pro se claimants in developing the record fully and fairly." We find no significant omission here. The ALJ questioned Scott at the hearing about the status of both his physical and mental conditions, and Scott replied that his physical condition remained unchanged from Dr. Dizon's

*Wilder* the ALJ appointed a psychiatrist to evaluate the claimant's mental condition, but then rejected the psychiatrist's conclusions that the claimant was suffering from disabling depression. *Id.* at 336. The court was incensed that the ALJ rejected the only medical opinion in the case, which he himself had sought, "concerning the critical issue of the date of onset of [the claimant's] depression." *Id.* at 337. Here, by contrast, no medical evidence supports Scott's tentative claims of mental impairment. By declining to inquire further than he did into Scott's alleged mental impairments, the ALJ was in line with the record evidence, not squarely against it.

last examination and that he had not been diagnosed or treated for any mental impairment. The ALJ probed into all the other relevant areas as well, asking detailed questions about how Scott's condition affected his ability to work, and inquiring into Scott's daily activities, his medication, physical abilities, and various hospitalizations. Even though Scott was the only witness, the hearing was lengthy, lasting 1 hour and ten minutes. *See Binion,* 13 F.3d at 245 (characterizing a one hour and twenty minute hearing as "comprehensive"). The documentary evidence was likewise well-developed: the ALJ compiled all the relevant medical records up to and past the time that Scott filed for benefits, and sought the opinion of an agency medical expert on Scott's RFC. While the ALJ has a heightened duty to assist an unrepresented claimant by developing the record, "how much evidence to gather is a subject on which we generally respect the [Commissioner's] reasoned judgment." *Luna,* 22 F.3d at 692. We find that the Commissioner has met his burden of proving a fully and fairly developed record here.

## C. Scott's Opportunity to Rebut by Showing an Evidentiary Gap

██ Determining that the Commissioner met his burden of proving that the ALJ fully and fairly developed the record is not conclusive. Scott may rebut this showing by pointing to an evidentiary gap in the record. *Binion,* 13 F.3d at 245. According to Scott, the record contains an evidentiary gap because the ALJ determined Scott could perform the full range of sedentary work without the benefit of testimony discussing Scott's ability to sit for prolonged periods. Social Security Rulings make clear that sedentary work demands an ability to sit for at least six hours in an eight-hour workday, at approximately two-hour intervals. Social Security Ruling ("SSR") 96–9p, 61 Fed.Reg. 34,478, 34,482 (July 2, 1996); SSR 83–10, at 179 (cum.

ed.1983).[10] Scott contends that the ALJ's question whether he could "sit all right" (followed by his affirmative response) is insufficient to fill this gap because it did not elicit how long Scott can sit at one time.

That might be true were the record devoid of any other evidence on this issue. But Scott ignores the RFC assessment performed by Dr. Feinerman, the agency-retained medical consultant, opining in September 1992 and again in May 1993 that Scott can sit, with "normal breaks," up to six hours in an eight-hour workday. Dr. Feinerman also found on both occasions that Scott is capable of lifting up to ten pounds on a regular basis, can stand and/or walk for at least two hours in an eight-hour workday, has an unlimited capacity to push and pull, and suffers no nonexertional limitations. These capabilities are compatible with the demands of sedentary work. *See* SSR 96–9p, 61 Fed.Reg. 34,478, 34,480 (July 2, 1996). And the ALJ was entitled to rely on Dr. Feinerman's opinion in determining that Scott is able to perform the full range of sedentary work. *See* 20 C.F.R. § 404.1527(f) (stating that ALJs may consider findings of nonexamining state agency medical consultants at the hearing level in making findings of fact and conclusions of law).

Scott argues that supporting the ALJ's finding with Dr. Feinerman's assessment is an impermissible post-hoc rationalization because the ALJ never mentioned Dr. Feinerman's report in the opinion. ALJs "must explain the weight given to these [state agency physician] opinions in their decisions." SSR 96–6p, 61 Fed.Reg. 34,466, 34,467 (July 2, 1996). Since the ALJ's opinion does not explicitly reference Dr. Feinerman's RFC assessment, Scott maintains, the ALJ must have rejected his opinion. We disagree. Although the ALJ does not mention Dr. Feinerman or his report by name, he clearly relied on it in holding that Scott can perform

10. The Seventh Circuit has elaborated on the weight to be accorded to Social Security Rulings: Social Security Rulings are "final opinions and orders and statements of policy and interpretations that have been adopted by the [Social Security] Administration and that are not published in the *Federal Register* . . . ." 20 C.F.R. § 442.408(1985). Once published, a ruling is "binding on all components of the Administration," *id,* including ALJs, and is to be relied upon as precedent in determining cases where the facts are basically the same. *See Johnson v. Heckler,* 769 F.2d 1202, 1205 (7th Cir.1985). *Warmoth v. Bowen,* 798 F.2d 1109, 1111 n. 5 (7th Cir.1986).

sedentary work: "Based on the medical evidence, the claimant can perform sedentary work, for example, lift 10 pounds and sit or stand and walk at least two hours in an eight-hour day on a sustained basis." (R.27) The source from which this information comes is Dr. Feinerman's report; by relying on it, the ALJ implicitly credited Dr. Feinerman's opinion, and it is clear from the ALJ's language that he gave it substantial weight. It bears mentioning that the ALJ is not required "to evaluate in writing every piece of testimony and evidence submitted." *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir.1985). We require only "a minimal level of articulation by the ALJ as to his assessment of the evidence." *Id.* The ALJ's express reliance on the contents of Dr. Feinerman's RFC assessment meets this standard.

Furthermore, the record contains no evidence calling into question Scott's ability to sit for prolonged periods. In particular, Scott's January 1991 X-ray showing "minor degenerative disease" in the spine following his car accident does not do so. No doctor opined that Scott suffered any functional restrictions whatsoever as a result, nor did any physician recommend follow-up treatment for this condition. *See* 20 C.F.R. § 404.1527(a)(1) ("You can only be found disabled if you are unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment...."). Indeed, the ALJ pointed out in his opinion that Scott testified to having taken an eight-hour car trip to Memphis without apparent difficulty just a few months before the hearing (R.25)—this testimony undermines any assertion that Scott is unable to sit for six hours in an eight-hour workday. Scott's speculation that a more searching inquiry might have revealed that Scott had difficulty sitting through the trip is just that—speculation.

In concluding that Scott has failed to demonstrate an evidentiary gap with regard to his sitting ability, leaving intact our holding that the ALJ met his duty to prove full and fair development of the record, we find the Seventh Circuit's determination in *Binion* instructive:

Plaintiff has not pointed to any specific facts that were not brought out during the hearing nor has she provided any new medical evidence. Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand.

13 F.3d at 246. Similarly, remand is inappropriate in this case.

### III. Substantial Evidence Review

Scott's second point of appeal requests this Court to reverse the ALJ's ruling on the ground that it is not supported by substantial evidence. In reviewing the ALJ's decision for substantial evidentiary support, we are not permitted to substitute our own judgment for the ALJ's; rather, "we look only for 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Perkins v. Chater*, 107 F.3d 1290, 1293 (7th Cir.1997) (quoting *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir.1995)). Thus, "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir.1985). Judicial review under this standard is quite limited. *Id.*

Our task is to determine whether substantial evidence supports the ALJ's conclusion that Scott is not disabled. In general, it is the claimant's duty to prove to the ALJ that he is disabled. 20 C.F.R. § 404.1512(a). "This means that [the claimant] must furnish medical and other evidence that the ALJ can use to reach conclusions about his medical impairment and its effect on his ability to work on a sustained basis." *Luna*, 22 F.3d at 693. A finding of disabled is warranted only if the claimant is "unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment...." 20 C.F.R. § 404.1527.

We hold that substantial evidence supports the ALJ's ruling that Scott is not disabled. Scott cannot point to a medically determinable impairment that prevents him from engaging in substantial gainful activity; neither his testimony, work history, nor med-

ical records sustain his claims. During the hearing, Scott was questioned repeatedly how his hypertension or enlarged heart prevented him from working, but could not supply an answer. Despite his history of multiple hospitalizations, severe hypertension and heart problems—which medical records indicate date back to the 1980s—Scott maintained a full-time job. Hospital records and treating physician reports list no functional restrictions on work-related activities; in fact, Scott was encouraged to increase his activity after being treated for severe hypertension at Thorek Hospital in February 1990. Finally, both Scott's treating physician, Dr. Dizon, and the SSA medical consultant opined that Scott could engage in activities compatible with sedentary work. The record reveals that the only time Scott's condition became unmanageable were periods when he was not taking medication. Each time he was admitted to the hospital and given medication, he improved within a few days. Given these facts, the ALJ was substantially supported in finding that Scott's medical condition does not prevent him from performing substantial gainful activity. *See Oliveras v. Shalala*, 870 F.Supp. 411, 414 (D.Mass.1994) ("[A] claimant is not guaranteed disability benefits merely because [he] suffers from a medically verifiable impairment. A claimant also must show that, due to [his] impairment, [he] is precluded from engaging in any substantial gainful activity within the entire national economy.") (citing *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S.Ct. 2287, 2291–92, 96 L.Ed.2d 119 (1987)).

In addition, the ALJ's opinion demonstrates that he considered all the evidence and based his conclusion on sound reasoning. As noted above, the ALJ went through the required five-step analysis. When he reached step five, the ALJ considered Scott's subjective assessments of his limitations as mandated by SSA regulations. *See* 20 C.F.R. § 404.1529. Weighing Scott's complaints against the medical records, expert physician opinions and Scott's testimony regarding his daily activities, the ALJ found that Scott's allegations of disability were not credible. Neither Scott's demeanor nor the medical signs, findings and abnormalities were consistent with Scott's claims. Dr. Dizon, the physician most familiar with Scott's condition, stated that Scott was capable of doing "work-related activities such as sitting, standing, moving about, lifting, carrying, handling objects, hearing, speaking, traveling." The SSA's retained expert came to the same conclusion, and no other medical evidence was to the contrary. Moreover, Scott admitted to undertaking light household chores, such as vacuuming, cooking, and making the beds, which undermined his claims that his condition left him unable to engage in sedentary work.[11]

"[A] claimant must provide credible testimony to obtain disability benefits based on pain or other symptoms, and the objective medical findings must show a condition that would reasonably be expected to produce that pain or those other symptoms." *Edwards v. Sullivan*, 985 F.2d 334, 337 (7th Cir.1993) (citations and internal quotations omitted). Normally, a reviewing court will not upset the ALJ's credibility determination if it finds some support in the record and is not patently wrong. *Id.* at 337–38. However, appellate review is more broad if the determination rests on "objective factors" as opposed to "subjective considerations," i.e., "elements that leave no trace that can be discerned in this or any other transcript." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir.1994). Here, the ALJ based his negative credibility assessment on both subjective considerations (Scott's demeanor) and objective considerations (comparison of Scott's claims to medical findings and self-reported activities). With regard to the ALJ's evaluation of Scott's demeanor, we are

---

11. The ALJ also factored into his determination Scott's testimony that he walked four blocks from the bus stop on the day of the hearing, Scott's receipt of unemployment benefits and accompanying pledge that he was ready, willing and able to work, and Scott's ability to work for two weeks during the summer of 1992. Scott objects to the ALJ's consideration of these points on numerous grounds. Because we find that the medical records, treating physician reports, RFC assessments, and Scott's admission to performing household duties are substantial support for the ALJ's decision, we do not address the significance or propriety of considering these other factors.

in no position to say it was patently wrong. And we uphold the ALJ's objectively grounded credibility determination, based on our analysis that Scott's claims of disabling impairment are out of line with the objective medical evidence and Scott's reported daily activities. *See Connor v. Shalala,* 900 F.Supp. 994, 1002 (N.D.Ill.1995) ("Dr. Vad's reports and Connor's daily regimen are substantial evidence to uphold the ALJ's conclusion that Connor was exaggerating the extent of his limitations.").

Scott's answer to all this is that the ALJ must be reversed because he failed to consider two other impairments—Scott's respiratory afflictions, which may impose environmental restrictions on his ability to work, and peripheral edema that causes Scott's hands to swell, which may limit his bilateral manual dexterity. According to Scott, these are potentially disabling nonexertional limitations. Therefore, the ALJ erred in relying on the Grid to direct his disability determination. *See* SSR 85–15, 1985 WL 56857, at *1–*2 (ruling that the ALJ cannot use the Grid to direct a finding if the claimant has any nonexertional limitations). This argument fails because the record contains no evidence that Scott experiences these limitations to a degree that even approaches a disabling impairment.

As evidence of respiratory impairment, Scott points to one test result from May 1993—a chest X-ray showing dyspnea and findings compatible with pneumonia and emphysema. However, this X-ray did not lead to a firm diagnosis. The voluminous medical records in this case nowhere indicate that Scott was being treated for any respiratory ailments; indeed, no doctor recommended follow-up on these findings. Dr. Dizon, who was the physician most intimately familiar with Scott's condition, did not indicate such problems in his reports.[12] Nor did any physician note that Scott's work should be restricted due to respiratory ailments, for example, by recommending a smoke or dust-free work environment. Scott's applications for benefits likewise mention nothing about respiratory problems, and he did not bring them to the ALJ's attention when the ALJ asked Scott if Scott wanted the ALJ to consider additional evidence in making his ruling. Thus, Scott's repeated comparison of himself to a patient with severe chronic obstructive pulmonary disease is unsupported by the record. The ALJ did not err in omitting discussion of respiratory impairments.

Scott's contention of disabling swelling in his hands due to peripheral edema is equally infirm. First, it is undermined by his hearing testimony that he is able to bathe, feed, and dress himself every day. Second, while the record contains evidence that Scott suffers occasionally from peripheral edema, no medical evidence corroborates Scott's claim of swollen hands. Scott cannot assume the manifestations of peripheral edema without pointing to some objective medical evidence confirming it. Finally, even assuming that peripheral edema inevitably results in swollen hands, nothing in the record indicates that Scott was functionally restricted in his bilateral manual dexterity, as Scott speculates.

In sum, the ALJ was not required to take notice of these alleged impairments because the record does not support their existence. Therefore, the ALJ did not err in turning to the Grid for a disability determination. Our comprehensive review of the entire record has failed to reveal any material evidentiary gaps in the ALJ's decision.

## CONCLUSION

For the reasons stated above, the ALJ fulfilled his duty to fully and fairly develop the record, and thus any question about the validity of Scott's waiver of representation does not require a remand. The ALJ's determination that Scott is not disabled is supported by substantial evidence. Accordingly, we deny Scott's motion for summary judgment and grant the Commissioner's motion for summary judgment. The decision of the

---

12. The exception is dyspnea, which Dr. Dizon *indicated was present in one of Scott's examinations.* Nevertheless, the medical records indicate that Scott had been exhibiting dyspnea on- and-off since 1989, when Scott was employed full time. Nothing in the record supports a finding that the dyspnea later escalated to a disabling degree.

ALJ is affirmed. The Clerk of the Court is directed to enter judgment, pursuant to Fed. R.Civ.P. 58, in favor of the defendant Commissioner and against plaintiff Scott.